# SOUTH DAKOTA *v.* NEVILLE

No. 81–1453.   Argued December 8, 1982—Decided February 22, 1983

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined.   STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 566.

*Mark V. Meierhenry*, Attorney General of South Dakota, argued the cause for petitioner. With him on the briefs was *Mark Smith*, Assistant Attorney General.

*David R. Gienapp* argued the cause and filed a brief for respondent.*

JUSTICE O'CONNOR delivered the opinion of the Court.

*Schmerber* v. *California*, 384 U. S. 757 (1966), held that a State could force a defendant to submit to a blood-alcohol test without violating the defendant's Fifth Amendment right against self-incrimination. We now address a question left open in *Schmerber, supra*, at 765, n. 9, and hold that the admission into evidence of a defendant's refusal to submit to such a test likewise does not offend the right against self-incrimination.

I

Two Madison, South Dakota, police officers stopped respondent's car after they saw him fail to stop at a stop sign. The officers asked respondent for his driver's license and asked him to get out of the car. As he left the car, respondent staggered and fell against the car to support himself.

---

*Briefs of *amici curiae* urging reversal were filed for the State of Indiana et al. by *Linley E. Pearson*, Attorney General of Indiana, and *Palmer K. Ward*, Deputy Attorney General, by *Donald M. Bouton*, Acting Attorney General of the Virgin Islands, and by the Attorneys General for their respective States as follows: *Charles A. Graddick* of Alabama, *Wilson L. Condon*, of Alaska, *Jim Smith* of Florida, *Tany S. Hong* of Hawaii, *Tyrone C. Fahner* of Illinois, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.*, of Louisiana, *James E. Tierney* of Maine, *Warren R. Spannaus* of Minnesota, *John D. Ashcroft* of Missouri, *Michael T. Greeley* of Montana, *Robert Abrams* of New York, *Rufus L. Edmisten* of North Carolina, *William J. Brown* of Ohio, *David Frohnmayer* of Oregon, *LeRoy S. Zimmerman* of Pennsylvania, *Daniel R. McLeod* of South Carolina, *William M. Leech, Jr.*, of Tennessee, *John J. Easton* of Vermont, *Chauncey H. Browning* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *Steven F. Freudenthal* of Wyoming; for Mothers Against Drunk Drivers, Inc., by *Hartley T. Hansen;* and for the Texas District and County Attorneys Association et al. by *David Crump*.

The officers smelled alcohol on his breath.  Respondent did not have a driver's license, and informed the officers that it was revoked after a previous driving-while-intoxicated conviction.  The officers asked respondent to touch his finger to his nose and to walk a straight line.  When respondent failed these field sobriety tests, he was placed under arrest and read his *Miranda* rights.[1]  Respondent acknowledged that he understood his rights and agreed to talk without a lawyer present.  App. 11.  Reading from a printed card, the officers then asked respondent to submit to a blood-alcohol test and warned him that he could lose his license if he refused.[2]  Respondent refused to take the test, stating "I'm too drunk, I won't pass the test."  The officers again read the request to

---

[1] The officer read the *Miranda* warning from a printed card.  He read: "You have the right to remain silent.  You don't have to talk to me unless you want to do so.  If you want to talk to me I must advise you whatever you say can and will be used as evidence against you in court.  You have the right to confer with a lawyer, and to have a lawyer present with you while you're being questioned.  If you want a lawyer but are unable to pay for one, a lawyer will be appointed to represent you free of any cost to you.  Knowing these rights, do you want to talk to me without having a lawyer present?  You may stop talking to me at any time.  You may also demand a lawyer at any time." App. 8.  See *Miranda* v. *Arizona*, 384 U. S. 436, 467–473 (1966).

[2] The card read: "I have arrested you for driving or being in actual physical control of a vehicle while under the influence of alcohol or drugs, a violation of S. D. C. L. 32–23–1.  I request that you submit to a chemical test of your blood to determine your blood alcohol concentration.  You have the right to refuse to submit to such a test and if you do refuse no test will be given.  You have the right to a chemical test by a person of your own choosing at your own expense in addition to the test I have requested.  You have the right to know the results of any chemical test.  If you refuse the test I have requested, your driver's license and any non-residence driving privilege may be revoked for one year after an opportunity to appear before a hearing officer to determine if your driver's license or non-residence driving privilege shall be revoked.  If your driver's license or non-residence driving privileges are revoked by the hearing officer, you have the right to appeal to Circuit Court.  Do you understand what I told you?  Do you wish to submit to the chemical test I have requested?" App. 8–10.

submit to a test, and then took respondent to the police station, where they read the request to submit a third time. Respondent continued to refuse to take the test, again saying he was too drunk to pass it.[3]

South Dakota law specifically declares that refusal to submit to a blood-alcohol test "may be admissible into evidence at the trial." S. D. Comp. Laws Ann. § 32–23–10.1 (Supp. 1982).[4] Nevertheless, respondent sought to suppress all evidence of his refusal to take the blood-alcohol test. The Circuit Court granted the suppression motion for three reasons: the South Dakota statute allowing evidence of refusal violated respondent's federal constitutional rights; the officers failed to advise respondent that the refusal could be used against him at trial; and the refusal was irrelevant to the issues before the court. The State appealed from the entire order. The South Dakota Supreme Court affirmed the suppression of the act of refusal on the grounds that § 32–23–10.1, which allows the introduction of this evidence, violated the federal and state privilege against self-incrimination.[5] 312 N. W. 2d 723 (1981). The court reasoned that

---

[3] Responding to other questions, respondent informed the officers that he had been drinking "close to one case" by himself at home, and that his last drink was "about ten minutes ago." Tr. of Preliminary Hearing 8.

[4] South Dakota Comp. Laws Ann. § 19–13–28.1 (Supp. 1982) likewise declares that, notwithstanding the general rule in South Dakota that the claim of a privilege is not a proper subject of comment by judge or counsel, evidence of refusal to submit to a chemical analysis of blood, urine, breath, or other bodily substance "is admissible into evidence" at a trial for driving under the influence of alcohol. A person "may not claim privilege against self-incrimination with regard to admission of refusal to submit to chemical analysis." *Ibid.*

[5] As JUSTICE STEVENS emphasizes, *post,* at 567, the South Dakota Supreme Court clearly held that the statute violated the State as well as Federal Constitution. Although this would be an *adequate* state ground for decision, we do not read the opinion as resting on an *independent* state ground. Rather, we think the court determined that admission of this evidence violated the Fifth Amendment privilege against self-incrimination, and then concluded without further analysis that the state privilege was

the refusal was a communicative act involving respondent's testimonial capacities and that the State compelled this communication by forcing respondent " 'to choose between submitting to a perhaps unpleasant examination and producing

violated as well.   In reaching its holding, the court first analyzed our decisions in *Schmerber* v. *California*, 384 U. S. 757 (1966), and *Miranda* v. *Arizona, supra.*   The court then described the issue for its review as being "[t]o determine whether the *Fifth Amendment* privilege against self-incrimination applies to refusal evidence," 312 N. W. 2d 723, 725 (1981) (emphasis added), and later asked "whether this testimonial evidence was compelled for purposes of applying the *Fifth Amendment* standard," *id.*, at 726 (emphasis added).   The cases relied on by the court to resolve these issues analyze the *federal* privilege against self-incrimination.

The analysis of the court below was remarkably similar to that of the state-court opinion reviewed in *Delaware* v. *Prouse*, 440 U. S. 648, 651–653 (1979).   That state-court opinion analyzed various decisions interpreting the Federal Constitution, concluded that the Fourth Amendment violated the police procedure at issue there, and then summarily held that the State Constitution was therefore also infringed.   As we characterized their analysis, every police practice found to violate the Fourth Amendment would, without further analysis, be held to be contrary to the State Constitution as well.   In such a situation, we concluded, this Court has jurisdiction to review the federal constitutional issue decided below.

JUSTICE STEVENS, while expressing general dissatisfaction with *Prouse*, attempts to distinguish it by noting that the state court there had said the State and Federal Constitutions are " 'substantially similar' and that 'a violation of the latter is necessarily a violation of the former.' " *Post*, at 571, n. 7.   But the South Dakota Supreme Court made virtually identical statements.   In a footnote, the court recognized the textual difference between the federal and state constitutional privileges against self-incrimination, but noted that this Court in *Schmerber* had interpreted the Fifth Amendment prohibition "in light of the more liberal definition of 'evidence' as used in our state constitution."   312 N. W. 2d, at 726, n.   Therefore, the court concluded, "[s]ince the Fifth Amendment of the U. S. Constitution is broad enough to exclude this evidence, there is no need to draw a distinction at this time between S. D. Const. Art. VI, § 9 and the Fifth Amendment of the U. S. Constitution." *Ibid.*   The court could not have stated more clearly that it simply assumed that any violation of the Fifth Amendment privilege also violated, without further analysis, the state privilege.   This was precisely the reasoning we found sufficient in *Prouse* to give us jurisdiction to hear the case and decide the federal constitutional issue.

testimonial evidence against himself,'" *id.*, at 726 (quoting *State* v. *Andrews*, 297 Minn. 260, 262, 212 N. W. 2d 863, 864 (1973), cert. denied, 419 U. S. 881 (1974)).[6]

Since other jurisdictions have found no Fifth Amendment violation from the admission of evidence of refusal to submit to blood-alcohol tests,[7] we granted certiorari to resolve the conflict.   456 U. S. 971 (1982).

## II

The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our Nation's highways.   The carnage caused by drunk drivers is well documented and needs no detailed recitation here.   This Court, although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy. See *Breithaupt* v. *Abram*, 352 U. S. 432, 439 (1957) ("The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield"); *Tate* v. *Short*, 401 U. S. 395, 401 (1971) (BLACKMUN, J., concurring) (deploring "traffic irresponsibility and the frightful carnage it spews upon our highways"); *Perez* v. *Campbell*, 402 U. S. 637, 657, 672 (1971) (BLACKMUN, J., concurring) (footnote omitted) ("The slaughter on the highways of this Nation exceeds the death toll of all our

---

[6] The South Dakota Supreme Court also remanded for a determination whether respondent's statement that he was too drunk to pass the test was made after a voluntary waiver of his right to remain silent.   As yet, of course, there has been no final judgment in this case.   This Court nevertheless has jurisdiction under 28 U. S. C. § 1257(3) to review the federal constitutional issue which has been finally determined, because if the State ultimately prevails at trial, the federal issue will be mooted; and if the State loses at trial, governing state law, S. D. Comp. Laws Ann. §§ 23A–32–4 and 23A–32–5 (1979), prevents it from again presenting the federal claim for review.   See *California* v. *Stewart* (decided with *Miranda* v. *Arizona*, 384 U. S. 436, 498, n. 71 (1966)); *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 481 (1975).

[7] See, *e. g.*, cases cited in nn. 11 and 13, *infra.*

wars"); *Mackey* v. *Montrym*, 443 U. S. 1, 17–19 (1979) (recognizing the "compelling interest in highway safety").

As part of its program to deter drinkers from driving, South Dakota has enacted an "implied consent" law. S. D. Comp. Laws Ann. § 32–23–10 (Supp. 1982). This statute declares that any person operating a vehicle in South Dakota is deemed to have consented to a chemical test of the alcoholic content of his blood if arrested for driving while intoxicated. In *Schmerber* v. *California*, 384 U. S. 757 (1966), this Court upheld a state-compelled blood test against a claim that it infringed the Fifth Amendment right against self-incrimination, made applicable to the States through the Fourteenth Amendment.[8] We recognized that a coerced blood test infringed to some degree the "inviolability of the human personality" and the "requirement that the State procure the evidence against an accused 'by its own independent labors,'" but noted the privilege has never been given the full scope suggested by the values it helps to protect. *Id.*, at 762. We therefore held that the privilege bars the State only from compelling "communications" or "testimony." Since a blood test was "physical or real" evidence rather than testimonial evidence, we found it unprotected by the Fifth Amendment privilege.

*Schmerber*, then, clearly allows a State to force a person suspected of driving while intoxicated to submit to a blood-alcohol test.[9] South Dakota, however, has declined to authorize its police officers to administer a blood-alcohol test against the suspect's will. Rather, to avoid violent confrontations, the South Dakota statute permits a suspect to

---

[8] *Schmerber* also rejected arguments that the coerced blood test violated the right to due process, the right to counsel, and the prohibition against unreasonable searches and seizures.

[9] *Schmerber* did caution that due process concerns could be involved if the police initiated physical violence while administering the test, refused to respect a reasonable request to undergo a different form of testing, or responded to resistance with inappropriate force. 384 U. S., at 760, n. 4.

refuse the test, and indeed requires police officers to inform the suspect of his right to refuse. S. D. Comp. Laws Ann. § 32–23–10 (Supp. 1982). This permission is not without a price, however. South Dakota law authorizes the Department of Public Safety, after providing the person who has refused the test an opportunity for a hearing, to revoke for one year both the person's license to drive and any nonresident operating privileges he may possess. § 32–23–11. Such a penalty for refusing to take a blood-alcohol test is unquestionably legitimate, assuming appropriate procedural protections. See *Mackey* v. *Montrym, supra.*

South Dakota further discourages the choice of refusal by allowing the refusal to be used against the defendant at trial. S. D. Comp. Laws. Ann. §§ 32–23–10.1 and 19–13–28.1 (Supp. 1982). *Schmerber* expressly reserved the question of whether evidence of refusal violated the privilege against self-incrimination. 384 U. S., at 765, n. 9. The Court did indicate that general Fifth Amendment principles, rather than the particular holding of *Griffin* v. *California*, 380 U. S. 609 (1965), should control the inquiry. 384 U. S., at 766, n. 9.[10]

Most courts applying general Fifth Amendment principles to the refusal to take a blood test have found no violation of the privilege against self-incrimination. Many courts, following the lead of Justice Traynor's opinion for the California Supreme Court in *People* v. *Sudduth*, 65 Cal. 2d 543, 421 P. 2d 401 (1966), cert. denied, 389 U. S. 850 (1967), have reasoned that refusal to submit is a physical act rather than a communication and for this reason is not protected by the

---

[10] *Griffin* held that a prosecutor's or trial court's comments on a defendant's refusal to take the witness stand impermissibly burdened the defendant's Fifth Amendment right to refuse. Unlike the defendant's situation in *Griffin*, a person suspected of drunk driving has no constitutional right to refuse to take a blood-alcohol test. The specific rule of *Griffin* is thus inapplicable.

privilege.[11]  As Justice Traynor explained more fully in the companion case of *People* v. *Ellis*, 65 Cal. 2d 529, 421 P. 2d 393 (1966) (refusal to display voice not testimonial), evidence of refusal to take a potentially incriminating test is similar to other circumstantial evidence of consciousness of guilt, such as escape from custody and suppression of evidence.  The court below, relying on *Dudley* v. *State*, 548 S. W. 2d 706 (Tex. Crim. App. 1977), and *State* v. *Andrews*, 297 Minn. 260, 212 N. W. 2d 863 (1973), cert. denied, 419 U. S. 881 (1974), rejected this view.  This minority view emphasizes that the refusal is "a tacit or overt expression and communication of defendant's thoughts," 312 N. W. 2d, at 726, and that the Constitution "simply forbids any compulsory revealing or communication of an accused person's thoughts or mental processes, whether it is by acts, failure to act, words spoken or failure to speak." *Dudley, supra,* at 708.

While we find considerable force in the analogies to flight and suppression of evidence suggested by Justice Traynor, we decline to rest our decision on this ground.  As we recognized in *Schmerber*, the distinction between real or physical evidence, on the one hand, and communications or testimony, on the other, is not readily drawn in many cases.  384 U. S., at 764.[12]  The situations arising from a refusal present a diffi-

---

[11] See, *e. g., Newhouse* v. *Misterly*, 415 F. 2d 514 (CA9 1969); *Hill* v. *State*, 366 So. 2d 318, 324–325 (Ala. 1979); *Campbell* v. *Superior Court*, 106 Ariz. 542, 479 P. 2d 685 (1971); *State* v. *Haze*, 218 Kan. 60, 542 P. 2d 720 (1975) (refusal to give handwriting exemplar); *City of Westerville* v. *Cunningham*, 15 Ohio St. 2d 121, 239 N. E. 2d 40 (1968).

[12] The Court in *Schmerber* pointed to the lie detector test as an example of evidence that is difficult to characterize as testimonial or real.  Even though the test may seek to obtain physical evidence, we reasoned that to compel a person to submit to such testing "is to evoke the spirit and history of the Fifth Amendment." 384 U. S., at 764.  See also *People* v. *Ellis*, 65 Cal. 2d 529, 537, and n. 9, 421 P. 2d 393, 397, and n. 9 (1966) (analyzing lie detector tests as within the Fifth Amendment privilege).  A second example of seemingly physical evidence that nevertheless invokes Fifth Amendment protection was presented in *Estelle* v. *Smith*, 451 U. S. 454 (1981).  There, we held that the Fifth Amendment privilege protected compelled

cult gradation from a person who indicates refusal by complete inaction, to one who nods his head negatively, to one who states "I refuse to take the test," to the respondent here, who stated "I'm too drunk, I won't pass the test." Since no impermissible coercion is involved when the suspect refuses to submit to take the test, regardless of the form of refusal, we prefer to rest our decision on this ground, and draw possible distinctions when necessary for decision in other circumstances.[13]

As we stated in *Fisher* v. *United States*, 425 U. S. 391, 397 (1976), "[t]he Court has held repeatedly that the Fifth Amendment is limited to prohibiting the use of 'physical or moral compulsion' exerted on the person asserting the privilege." This coercion requirement comes directly from the constitutional language directing that no person "shall be *compelled* in any criminal case to be a witness against himself." U. S. Const., Amdt. 5 (emphasis added). And as Professor Levy concluded in his history of the privilege, "[t]he element of compulsion or involuntariness was always an ingredient of the right and, before the right existed, of protests against incriminating interrogatories." L. Levy, Origins of the Fifth Amendment 328 (1968).

Here, the State did not directly compel respondent to refuse the test, for it gave him the choice of submitting to the test or refusing. Of course, the fact the government gives a defendant or suspect a "choice" does not always resolve the

---

disclosures during a court-ordered psychiatric examination. We specifically rejected the claim that the psychiatrist was observing the patient's communications simply to infer facts of his mind, rather than to examine the truth of the patient's statements.

[13] Many courts have found no self-incrimination problem on the ground of no coercion, or on the analytically related ground that the State, if it can compel submission to the test, can qualify the right to refuse the test. See, *e. g.*, *Welch* v. *District Court*, 594 F. 2d 903 (CA2 1979); *State* v. *Meints*, 189 Neb. 264, 202 N. W. 2d 202 (1972); *State* v. *Gardner*, 52 Ore. App. 663, 629 P. 2d 412 (1981); *State* v. *Brean*, 136 Vt. 147, 385 A. 2d 1085 (1978).

compulsion inquiry.    The classic Fifth Amendment viola-
tion—telling a defendant at trial to testify—does not, under
an extreme view, compel the defendant to incriminate him-
self.    He could submit to self-accusation, or testify falsely
(risking perjury) or decline to testify (risking contempt).
But the Court has long recognized that the Fifth Amendment
prevents the State from forcing the choice of this "cruel
trilemma" on the defendant.    See *Murphy* v. *Waterfront
Comm'n,* 378 U. S. 52, 55 (1964).    See also *New Jersey* v.
*Portash,* 440 U. S. 450, 459 (1979) (telling a witness under a
grant of legislative immunity to testify or face contempt
sanctions is "the essence of coerced testimony").    Similarly,
*Schmerber* cautioned that the Fifth Amendment may bar the
use of testimony obtained when the proffered alternative was
to submit to a test so painful, dangerous, or severe, or so
violative of religious beliefs, that almost inevitably a per-
son would prefer "confession."    384 U. S., at 765, n. 9.[14]
Cf. *Miranda* v. *Arizona,* 384 U. S. 436, 458 (1966) (unless
compulsion inherent in custodial surroundings is dispelled, no
statement is truly a product of free choice).

In contrast to these prohibited choices, the values behind
the Fifth Amendment are not hindered when the State of-
fers a suspect the choice of submitting to the blood-alcohol
test or having his refusal used against him.    The simple
blood-alcohol test is so safe, painless, and commonplace, see
*Schmerber,* 384 U. S., at 771, that respondent concedes, as
he must, that the State could legitimately compel the sus-
pect, against his will, to accede to the test.    Given, then,
that the offer of taking a blood-alcohol test is clearly legiti-
mate, the action becomes no *less* legitimate when the State
offers a second option of refusing the test, with the attendant
penalties for making that choice.    Nor is this a case where
the State has subtly coerced respondent into choosing the op-
tion it had no right to compel, rather than offering a true

---

[14] Nothing in the record suggests that respondent made or could sustain
such a claim in this case.

choice. To the contrary, the State wants respondent to choose to take the test, for the inference of intoxication arising from a positive blood-alcohol test is far stronger than that arising from a refusal to take the test.

We recognize, of course, that the choice to submit or refuse to take a blood-alcohol test will not be an easy or pleasant one for a suspect to make. But the criminal process often requires suspects and defendants to make difficult choices. See, *e. g.*, *Crampton* v. *Ohio*, decided with *McGautha* v. *California*, 402 U. S. 183, 213–217 (1971). We hold, therefore, that a refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination.[15]

### III

Relying on *Doyle* v. *Ohio*, 426 U. S. 610 (1976), respondent also suggests that admission at trial of his refusal violates the Due Process Clause because respondent was not fully warned of the consequences of refusal. *Doyle* held that the Due Process Clause prohibits a prosecutor from using a defendant's silence after *Miranda* warnings to impeach his testimony at trial. Just a Term before, in *United States* v. *Hale*, 422 U. S. 171 (1975), we had determined under our supervisory power that the federal courts could not use such silence for impeachment because of its dubious probative value. Al-

---

[15] In the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of *Miranda*. As we stated in *Rhode Island* v. *Innis*, 446 U. S. 291, 301 (1980), police words or actions "normally attendant to arrest and custody" do not constitute interrogation. The police inquiry here is highly regulated by state law, and is presented in virtually the same words to all suspects. It is similar to a police request to submit to fingerprinting or photography. Respondent's choice of refusal thus enjoys no prophylactic *Miranda* protection outside the basic Fifth Amendment protection. See generally Arenella, *Schmerber* and the Privilege Against Self-Incrimination: A Reappraisal, 20 Am. Crim. L. Rev. 31, 56–58 (1982).

though *Doyle* mentioned this rationale in applying the rule to the States, 426 U. S., at 617, the Court relied on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial. *Id.*, at 618.

Unlike the situation in *Doyle*, we do not think it fundamentally unfair for South Dakota to use the refusal to take the test as evidence of guilt, even though respondent was not specifically warned that his refusal could be used against him at trial. First, the right to silence underlying the *Miranda* warnings is one of constitutional dimension, and thus cannot be unduly burdened. See *Miranda, supra,* at 468, n. 37. Cf. *Fletcher* v. *Weir*, 455 U. S. 603 (1982) (postarrest silence without *Miranda* warnings may be used to impeach trial testimony). Respondent's right to refuse the blood-alcohol test, by contrast, is simply a matter of grace bestowed by the South Dakota Legislature.

Moreover, the *Miranda* warnings emphasize the dangers of choosing to speak ("whatever you say can and will be used as evidence against you in court"), but give no warning of adverse consequences from choosing to remain silent. This imbalance in the delivery of *Miranda* warnings, we recognized in *Doyle*, implicitly assures the suspect that his silence will not be used against him. The warnings challenged here, by contrast, contained no such misleading implicit assurances as to the relative consequences of his choice. The officers explained that, if respondent chose to submit to the test, he had the right to know the results and could choose to take an additional test by a person chosen by him. The officers did not specifically warn respondent that the test results could be used against him at trial.[16] Explaining the consequences of

---

[16] Even though the officers did not specifically advise respondent that the test results could be used against him in court, no one would seriously contend that this failure to warn would make the test results inadmissible, had respondent chosen to submit to the test. Cf. *Schneckloth* v. *Busta-*

the other option, the officers specifically warned respondent that failure to take the test could lead to loss of driving privileges for one year. It is true the officers did not inform respondent of the further consequence that evidence of refusal could be used against him in court,[17] but we think it unrealistic to say that the warnings given here implicitly assure a suspect that no consequences other than those mentioned will occur. Importantly, the warning that he could lose his driver's license made it clear that refusing the test was not a "safe harbor," free of adverse consequences.

While the State did not actually warn respondent that the test results could be used against him, we hold that such a failure to warn was not the sort of implicit promise to forgo use of evidence that would unfairly "trick" respondent if the evidence were later offered against him at trial. We therefore conclude that the use of evidence of refusal after these warnings comported with the fundamental fairness required by due process.

## IV

The judgment of the South Dakota Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

The Court is understandably anxious to do its part in curtailing the "carnage caused by drunk drivers." *Ante,* at 558. I sympathize with that concern, but it does not justify the rendition of an advisory opinion on a constitutional issue. In

---

*monte,* 412 U. S. 218 (1973) (knowledge of right to refuse not an essential part of proving effective consent to a search).

[17] Since the State wants the suspect to submit to the test, it is in its interest fully to warn suspects of the consequences of refusal. We are informed that police officers in South Dakota now warn suspects that evidence of their refusal can be used against them in court. Tr. of Oral Arg. 16.

this case, the Court has no power to reverse the judgment of the South Dakota Supreme Court, because its decision rests on an adequate and independent state ground. I therefore cannot join the Court's opinion.

The South Dakota Supreme Court framed the question before it on appeal as "whether SDCL 32–23–10.1 is a violation of Neville's federal and state constitutional privilege against self-incrimination. U. S. Const. Amend. V; S. D. Const. art. VI, § 9." 312 N. W. 2d 723, 725 (1981). After analyzing both federal and state cases, the South Dakota Supreme Court concluded:

> "We hold that evidence of the accused's refusal to take a blood test violates the federal and state privilege against self-incrimination and therefore SDCL 32–23–10.1 is unconstitutional." *Id.*, at 726.

Thus, the South Dakota Supreme Court unambiguously held that the statute violated the State Constitution. That holding is certainly adequate to support its judgment and is beyond our power to review.

Given the existence of an adequate state ground, it is established beyond dispute that this Court may not take jurisdiction if the state ground is independent.[1] In this case, we lack jurisdiction because the South Dakota Supreme Court has not indicated, explicitly or implicitly, that its construction of Art. VI, § 9, of the South Dakota Constitution was contin-

---

[1] "[W]e will not review a judgment of a state court that rests on an adequate and independent ground in state law. Nor will we review one until the fact that it does not do so appears of record." *Herb* v. *Pitcairn,* 324 U. S. 117, 128 (1945). Accord, *Jankovich* v. *Indiana Toll Road Comm'n,* 379 U. S. 487 (1965); *Honeyman* v. *Hanan,* 300 U. S. 14, 18–19 (1937); *Fox Film Corp.* v. *Muller,* 296 U. S. 207 (1935); *Lynch* v. *New York ex rel. Pierson,* 293 U. S. 52 (1934); *McCoy* v. *Shaw,* 277 U. S. 302 (1928); *Petrie* v. *Nampa and Meridian Irrigation District,* 248 U. S. 154, 157 (1918); *Enterprise Irrigation District* v. *Farmers Mutual Canal Co.,* 243 U. S. 157, 163–166 (1917); *Eustis* v. *Bolles,* 150 U. S. 361 (1893); *Murdock* v. *Memphis,* 20 Wall. 590 (1875).

gent on our agreement with its interpretation of the Fifth Amendment to the United States Constitution.[2]  There is no general presumption of federal law, no general presumption of state law, and no specific language in the opinion below to suggest that the South Dakota Court harbored such an opinion.

Unless we have explicit notice that a provision of a State Constitution is intended to be a mere shadow of the comparable provision in the Federal Constitution, it is presumptuous—if not paternalistic—for this Court to make that assumption on its own.  No matter how eloquent and persuasive our analysis of the Federal Constitution may be, we cannot simply *presume* that the highest court of a sovereign State will modify its interpretation of its own law whenever we interpret comparable federal law differently.  Even when a state tribunal misconceives federal law, this Court cannot vacate its judgment merely to give it an unsolicited opportunity to reanalyze its own law.[3]  If a state-court judg-

---

[2] As Justice Harlan wrote for the Court in *Mental Hygiene Dept.* v. *Kirchner*, 380 U. S. 194, 198 (1965):

"[W]e would have jurisdiction to review only if the federal ground had been the *sole* basis for the decision, or the State Constitution was interpreted under what the state court deemed the compulsion of the Federal Constitution" (emphasis in original) (footnote omitted).

[3] "[O]ur power is to correct wrong judgments, not to revise opinions. We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion." *Herb* v. *Pitcairn, supra*, at 126.  Accord, *Minnick* v. *California Dept. of Corrections*, 452 U. S. 105, 120–123 (1981); *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 568–569 (1947); *United States* v. *Hastings*, 296 U. S. 188, 193 (1935).

The policy of avoiding advisory opinions on federal constitutional issues is a consistent theme throughout our jurisprudence.  *Paschall* v. *Christie-Stewart, Inc.*, 414 U. S. 100 (1973) *(per curiam)*, is especially instructive. In that case, our independent review of the record turned up a state ground supporting the Supreme Court of Oklahoma's judgment that had not even been *mentioned* in the state court's opinion.  Observing that if

ment is premised on an adequate state ground, that ground must be presumed independent unless the state court suggests otherwise.[4]

Nothing in South Dakota law establishes a presumption that the State Constitution adds no additional protections for South Dakota residents beyond those already provided by the Fourteenth Amendment to the Federal Constitution. Indeed, the South Dakota Supreme Court has explicitly established a contrary presumption:

> "This court is the final authority on interpretation and enforcement of the South Dakota Constitution. We have always assumed the independent nature of our state constitution regardless of any similarity between the language of that document and the federal constitution." *State* v. *Opperman,* 247 N. W. 2d 673, 674 (1976).[5]

the argument proved solid, "any decision by this Court would be advisory and beyond our jurisdiction," we remanded for analysis of the state-law claim. *Id.*, at 102.

Even in cases arising through the *federal* courts, we have always been alert to opportunities to avoid federal constitutional issues by means of a state-law disposition. *E. g., Mills* v. *Rogers*, 457 U. S. 291, 302–306 (1982); *City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U. S. 283, 294–295 (1982); *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175 (1909). See generally *Hagans* v. *Lavine*, 415 U. S. 528, 546–547, and nn. 12–13 (1974).

[4] The burden is on the petitioner or appellant to establish our jurisdiction. We have therefore regularly dismissed cases when the state judgment *might* have rested on an independent and adequate state ground. *E. g., Durley* v. *Mayo*, 351 U. S. 277, 285 (1956); *Stembridge* v. *Georgia*, 343 U. S. 541, 547 (1952); *Lynch* v. *New York ex rel. Pierson, supra; Johnson* v. *Risk*, 137 U. S. 300 (1890).

[5] The South Dakota Supreme Court was speaking on remand from this Court. The state court had previously held certain police conduct unconstitutional, relying *solely* on the Fourth Amendment to the Federal Constitution. *State* v. *Opperman*, 89 S. D. 25, 228 N. W. 2d 152 (1975). This Court had reversed. *South Dakota* v. *Opperman*, 428 U. S. 364 (1976). The passage in text is excerpted from the South Dakota Supreme Court's reaffirmation of the rationale of its prior opinion, relying on the State Constitution. In reaching its conclusion, the court noted that the language of

Thus, both federal and South Dakota law establish the presumption that an adequate state ground is independent. That presumption is reinforced in this case. For the opinion of the South Dakota Supreme Court explicitly noted that the language of the South Dakota Constitution is "more liberal" than the comparable federal language. 312 N. W. 2d, at 726, n.[6] It was willing to rest the judgment on federal as well as state grounds, however, because this Court's opinion in *Schmerber* v. *California*, 384 U. S. 757, 761–762, n. 6 (1966), had assumed that the Fifth Amendment should be construed as broadly as the more liberal state language. 312 N. W. 2d, at 726, n. It concluded that federal law is "broad enough" to exclude the evidence in this case, and it therefore saw "no need to draw a distinction *at this time*" between state and federal law. *Ibid.* (emphasis added). Those words plainly suggest that the State Supreme Court did not understand its holding to be "dependent" on this Court's view of federal law.[7]

---

the relevant state provision "is almost identical to that found in the Fourth Amendment," 247 N. W. 2d, at 674, and was unmoved by the prosecutor's observation that the defendant had not argued in his first appeal that state and federal law were different, *id.,* at 675.

[6] After quoting a footnote from our opinion in *Schmerber* v. *California,* 384 U. S. 757, 761–762, n. 6 (1966), the South Dakota Supreme Court stated:

"This footnote indicates that *Schmerber* was decided in light of the more liberal definition of 'evidence' as used in our state constitution. Since the Fifth Amendment of the U. S. Constitution is broad enough to exclude this evidence, there is no need to draw a distinction at this time between S. D. Const. art. VI, § 9 and the Fifth Amendment of the U. S. Constitution." 312 N. W. 2d, at 726, n.

[7] In *Delaware* v. *Prouse,* 440 U. S. 648, 651–653 (1979), we did not so interpret the opinion of the Delaware Supreme Court. Although I must confess that I now have some misgivings about our reaching that conclusion without further clarification, see n. 8, *infra,* there was far more indication in that case than in this one that the state court's analysis was contingent on the correctness of its understanding of federal law. The opinion there began with a statement that the police stops "violate Federal and State

Because there exists an independent and adequate state ground for the judgment below, I would dismiss the writ of certiorari.[8]

constitutional guarantees," *State* v. *Prouse*, 382 A. 2d 1359, 1361 (1978), but then went on to say that the State and Federal Constitutions are "substantially similar" and that "a violation of the latter is necessarily a violation of the former," *id.*, at 1362. The opinion drew to a close with the statement: "We hold, therefore, that a random stop of a motorist [absent reasonable suspicion] is constitutionally impermissible and violative of the Fourth and Fourteenth Amendments to the United States Constitution." *Id.*, at 1364.

[8] In cases where an apparent adequate state ground was arguably not independent, this Court has occasionally vacated the state-court judgment and remanded for clarification of the basis for the decision. *E. g.*, *Air Pollution Variance Board* v. *Western Alfalfa Corp.*, 416 U. S. 861, 866 (1974); *California* v. *Krivda*, 409 U. S. 33 (1972); *Mental Hygiene Dept.* v. *Kirchner*, 380 U. S. 194 (1965); *Minnesota* v. *National Tea Co.*, 309 U. S. 551 (1940); *State Tax Comm'n* v. *Van Cott*, 306 U. S. 511 (1939). Cf. *Herb* v. *Pitcairn*, 324 U. S. 117 (1945) (case held while parties sought a certificate from the state court clarifying the basis for judgment). The Court should, at the very least, follow that course today. "[I]n cases where the answer is not clear to us, it seems consistent with the respect due the highest courts of states of the Union that they be asked rather than told what they have intended." *Id.*, at 127–128.

Some of us have pointed out that even this practice may be overused, because it "tak[es] from appellants the normal burden of demonstrating that we have jurisdiction and plac[es] it on the Supreme Court of [the State]." *Philadelphia Newspapers, Inc.* v. *Jerome*, 434 U. S. 241, 244 (1978) (REHNQUIST, J., joined by STEVENS, J., dissenting). See also *Department of Motor Vehicles of California* v. *Rios*, 410 U. S. 425, 427–430 (1973) (Douglas, J., joined by BRENNAN, Stewart, and MARSHALL, JJ., dissenting).