Kerry H. STOWELL, Petitioner,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF TRANSPORTATION, BUREAU OF MOTOR VEHICLE SERVICES, Respondent.

No. 85–127.

District of Columbia Court of Appeals.

Argued Jan. 2, 1986.
Decided Aug. 26, 1986.

---

13. Needless to say, this is hardly the best way to establish venue as a matter of routine practice.

Ruth L. Prokop, with whom G. Allen Dale, Washington, D.C., was on brief, for petitioner.

Michele Giuliani, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel and Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., were on brief, for respondent.

Before MACK, NEWMAN and ROGERS, Associate Judges.

PER CURIAM:

Kerry Hart Stowell challenges a decision by the Bureau of Motor Vehicle Services to revoke her driver's license for the period of one year. The final decision of the Bureau resulted from findings by the hearing examiner that Stowell had operated a motor vehicle while under the influence of intoxicating liquor, 18 DCMR § 302.5 (1981), and that she had refused to submit to two chemical tests for alcohol after having been warned of the consequences of refusal, D.C.Code § 40–505 (1985 Supp.). We affirm in part, reverse in part, and remand for proceedings not inconsistent with this opinion.

## I

Shortly after midnight on February 17, 1984, Kerry Stowell was arrested for driving under the influence and taken to the Traffic Division headquarters. Although five witnesses testified at subsequent hearings [1] about events at the station house, what actually happened there is unclear. Two of the witnesses were police officers testifying about routine arrests made months before the hearings and the other three witnesses, by other accounts, were intoxicated at the time of the incident.[2] Because we are asked to review the conclusions of the hearing examiner, drawn from contradictory testimony, we recite it at some length.

Officer Jeffrey Williams testified that he had stopped Stowell's car because it was being driven erratically. When Williams approached Stowell, he saw that her eyes were bloodshot and he smelled alcohol on her breath. Her speech was slurred. Because Stowell would not cooperate with his attempts to administer the field sobriety tests, and one of her companions physically interfered with these efforts, Williams called for a back-up police unit. He then arrested Stowell, and took her to the stationhouse.

Williams insisted that he was present throughout Stowell's processing at the precinct. The implied consent form [3] was read to Stowell twice, and explained to her in laymen's language once, but she refused to sign the document because she could not read without her glasses. Stowell also told Williams that she did not understand the form. Williams remembered that at some point in the processing an officer tore up and threw away a paper that may have been a copy of the implied consent form. Williams had no recollection of Stowell's changing her position and volunteering to take the breathalyzer test.

---

1. Two hearings were held. This summary of the evidence of record combines testimony from both hearings.

2. Stowell and Kunze had been arrested for driving while intoxicated; Larson had been charged with being drunk and disorderly.

3. The District of Columbia Code gives a driver arrested for driving while under the influence a choice: submit to a chemical test that might be used against him in a criminal or an administrative proceeding, or refuse to submit to the test. Refusal to submit to the test results in immediate revocation of driving privileges. D.C.Code § 40–505(a) (1985 Supp.). That the choice must be an informed one is demonstrated by the requirement that the officer administering the test must advise the driver of the consequences of refusal. *Id.; see also District of Columbia v. Onley,* 399 A.2d 84, 87 (D.C.1979).

Officer Daniel Hodge testified that he saw Stowell inside the precinct that night. He did not remember whether he processed any drivers in the alcohol van outside the station that evening. Stowell refused to answer when asked if she had read the implied consent form, and then declined to take the test. Hodge testified that he had processed Stowell, but he did not recall her asking for her glasses. Although he did not remember advising Stowell of her *Miranda* rights, Hodge was certain that they had been read to her because that was standard procedure. Hodge stated that Williams was at the stationhouse, but was unsure about whether Williams was with Stowell during the entire time that she was being processed.

Stowell testified in her own behalf, beginning her account with her arrival at the precinct. As soon as she was taken into the stationhouse, an officer began reading her rights and screaming at her to sign "a form." Stowell maintained that Williams was not in the room while she was being processed, but she admitted that her "back was to anything that was going on at the desk." She told him that she did not understand the contents of the document. She signed only after the officer told her that if she did not sign the form she would go to jail and her license would be suspended for a year.[4]

Then Stowell was given a second paper and told to sign that. She refused to sign because she was unable to read it without her glasses and she claimed that the policeman would not read it to her. Another arrested driver, Eric Kunze, and the officer both told her to sign it, but she was steadfast in her refusal because she could not read it. Then the officer told her that he "had had it" with her and began "ripping papers." She recalled being informed that she would "go to jail" and lose her driving privileges for a year if she did not sign the form, but she insisted that no police officer ever advised her that her license would be revoked if she refused to take an alcohol test. When Stowell finally volunteered to take the test after other arrested drivers explained the procedure to her, she was told it was "too late." The whole incident took only ten to fifteen minutes. Stowell spent the rest of the night in custody.

Eric Kunze testified that Stowell refused to sign the papers because she could not read them without her glasses and because she did not understand the explanation given her by the police officer who was processing her. The officer left the room, then returned, grabbed the papers and tore them up. When he returned about ten minutes later, Stowell volunteered to take the test, but was told it was too late.

William Larson[5] testified that Stowell had refused to sign papers because she did not understand what she was reading. The officer refused to explain the forms to her, saying they were "in plain English." When the officer left the room, Larson and Kunze tried to explain the documents and encouraged Stowell to sign. Nevertheless, when the officer returned about five minutes later, Stowell told him that she would not "sign without representation from someone to explain it to her." The officer took the papers and again left the room.

---

**4.** Apparently the only form which Stowell signed was a *Miranda* card. Her testimony revealed confusion about the various documents she was asked to sign. A review of the testimony and other evidence of record suggests that Stowell was presented with three forms. On arrival, she was probably informed of her rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked to sign a document acknowledging this notification. The hearing examiner noted, at the request of Stowell's counsel, that this form (PD–47) was missing from the record.

Stowell was also asked to sign an implied consent form (PD–29) and a notice of proposed suspension. Copies of these forms are in the record. Officer Hodge signed the PD–29 as the advising officer; Officer Milton James signed the notification of proposed suspension. Both of these forms bore notes that Stowell had refused to sign them.

**5.** Larson was a friend of Kunze, and was arrested with him.

Then Larson and Kunze explained that if Stowell signed the forms she would be released. When the officer returned, Stowell said that she wanted to take the test, but he told her that "she wouldn't get a second chance."

Joann Hoy testified that she had been with Stowell from 1:30 p.m. on February 16 until her arrest in the early morning of February 17. Stowell drank a wine spritzer with lunch, and another late in the afternoon or early in the evening. They both arrived at a restaurant for dinner at 8:45 p.m.; while they were there, Stowell drank a small Margarita and had a sip of another. About midnight, they went to a bar where Stowell had one beer. They left that bar to visit another, but the second bar had closed before they arrived. It was after they had returned to the car after trying to enter the second bar and driven about half a block that Officer Williams stopped them. She claimed that at no time was Stowell driving erratically, although she admitted they had been holding hands and "acting silly" before they entered the car the last time.

## II

The Bureau of Motor Vehicle Services conducted a show cause hearing on June 21, 1984.[6] The hearing examiner found that Stowell had operated a vehicle under the influence of intoxicating liquor, and that she had refused to take the alcohol tests. He ordered that her license be immediately suspended for twelve months.

Stowell filed an appeal within the agency, alleging that there was not substantial evidence of refusal. She also asserted that because she had not been convicted in the District of Columbia Superior Court for driving under the influence of intoxicating liquor, the Department of Transportation did not have authority to revoke her license.[7] The decision to suspend her license pending the final show cause hearing was affirmed. A final show cause hearing was scheduled for September 24, 1984.

In August, Stowell filed an application to take the deposition of two police officers, Milton James and Daniel Hodge. The application was granted. The deposition was scheduled for September 19, 1984, and the officers were notified to bring with them pertinent records. However, no subpoenas were requested, and none was issued. On the appointed day both officers appeared for the deposition, but neither brought any records. The deposition was recessed for approximately an hour and a quarter so that the officers could obtain the records.

When the proceeding was reconvened, the examiner stated that the Office of the Corporation Counsel had advised the police officers not to appear for the deposition and that Corporation Counsel would not release the documents without a subpoena from Stowell. Her attorney pointed out to the examiner that under 18 DCMR § 1020.1 the hearing examiner had authority to subpoena witnesses. The examiner replied that "[I]n this matter, the officers shall be subpoenaed by [Stowell]" and that the Corporation Counsel's office had stated that "they were not going to release the germane records to these officers without a subpoena from your office." The final show cause hearing was postponed until October 12, 1984.

Superior Court subpoenas duces tecum for James and Hodge were prepared by Stowell's counsel, and served on the desk officer at their assigned precinct. The subpoenas directed the officers to appear for depositions on October 2, 1984 at the Department of Transportation. According to

---

6. Stowell was served with an official notice of proposed suspension at the precinct on February 17, 1984. Under Bureau of Motor Vehicle Services procedures, a District of Columbia driver served with such a notice has five days to request a hearing. 18 DCMR § 1005.2. Stowell did request such a hearing.

7. The Office of the Corporation Counsel had filed charges that Stowell had violated D.C.Code § 40–716(b), but these were dismissed after the first show cause hearing.

pleadings in the agency record, neither officer appeared. Counsel for the petitioner assert that the deposition had been scheduled with the consent of the hearing examiner. However, they allege, when counsel arrived for the deposition, the examiner stated that he was unaware that a deposition had been scheduled.

The final show cause hearing was held on October 12, 1984. After taking more testimony, and listening to argument, again the examiner ruled that Stowell's license was to be revoked for one year for refusal to submit to alcohol testing and for driving under the influence. The revocation was affirmed by the Assistant Director, Bureau of Motor Vehicle Services, on January 8, 1985. This appeal followed.

### III

Petitioner claims that numerous errors by District of Columbia police officers and by the Bureau of Motor Vehicle Services mandate reversal of the decision that she challenges. Most of the arguments she advances are unpersuasive.

### A

■ Petitioner's claim that police officers violated her rights under *Miranda v. Arizona, supra* note 4, does not withstand scrutiny. This court has previously held that the *Miranda* right to silence is not implicated in a defendant's refusal to submit to an alcohol test. *District of Columbia v. Clark,* 468 A.2d 961 (D.C.1983) (relying on *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983)). Stowell's reliance on a more recent decision of the Supreme Court, *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), is misplaced. Although petitioner is correct that *Berkemer* extends the protection of *Miranda* to those arrested for misdemeanor drunk driving violations, *Berkemer* has no application to the case at bar.

At issue in *Berkemer* were admissions made to police officers about the quantity of alcohol Berkemer had consumed and Berkemer's own appraisal of his sobriety. Berkemer was stopped by police because his car had been weaving in and out of a highway lane. In response to questions posed by the arresting officer, Berkemer admitted that shortly before he had imbibed two beers and had smoked several joints of marijuana. After being transported to the local jail, he was tested by an instrument called an "intoxilyzer." The results indicated that no alcohol was present in his body. However, when Berkemer was again asked whether he had been drinking, Berkemer admitted that he had. Then he was asked if he was under the influence of alcohol. He responded, "I guess, barely." He was also directed to note on a form whether the marijuana had been laced with any other chemicals. He wrote "No ang[el] dust or PCP in the pot" above his signature.

These various admissions formed the basis for Berkemer's claim. Those statements cannot be equated with a refusal to take a chemical test to determine the alcohol content of one's blood. Moreover, the record before us contains no admission made by Stowell. Williams testified that before reading Stowell her rights, he asked whether she had been drinking. She replied she had not. Consequently, not only does *Berkemer* not overrule *Clark,* but it is inapposite to the case at bar. *Clark* remains good law and defeats petitioner's claim of error.

### B

■ Petitioner also asserts that the Bureau of Motor Vehicle Services acted outside the scope of its authority when it revoked her driving privileges. The District of Columbia Code empowers the Mayor or his designated agent to revoke operators' permits "for any cause which he or his agent may deem sufficient." D.C.Code § 40–302(a) (1981). The Bureau has adopted rules allowing its director, after notice and an opportunity for hearing, to revoke licenses upon a showing by suffi-

cient evidence of grounds enumerated in its regulations. 18 DCMR § 300.2.[8] Revocation of operators' permits occurs in two contexts. The Bureau has made revocation mandatory in some cases; in others, whether to revoke or suspend driving privileges is within the discretion of the director. Revocation is mandatory for those drivers convicted of violating D.C.Code § 40–716(b).[9] *See* 18 DCMR § 301.1(a).

However, the Director of the Bureau of Motor Vehicle Services also has the authority to revoke or suspend the driving privileges of anyone who has been "operating a motor vehicle while under the influence of intoxicating liquor or drug(s)...." *Id.* at 302.5. Under this section, the director determines—after notice and hearing—whether the driver was operating while under the influence. *See* note 8, *supra.* As was done in this case, the driver may present evidence and argument. Therefore, the District of Columbia has adopted a two-pronged scheme to deal with the community problem of drunk drivers. Those who are convicted of a code violation are subject to possible criminal penalties but mandatory revocation. Drivers who are the subject of administrative findings are liable for no criminal penalty but possible revocation under the discretionary authority of the Director of the Bureau of Motor Vehicle Services.

This court has previously upheld the authority of the District of Columbia Department of Motor Vehicles to revoke a driver's license following an administrative determination that the operator had driven a motor vehicle in such manner as to show "a fla-grant disregard for the safety of persons or property...." *Bungardeanu v. England,* 219 A.2d 104, 107 (D.C.1966).[10] In that case, we explained that the purpose of revocation is to protect the public from those drivers who have demonstrated that their behavior behind the wheel of a vehicle presents a hazard to life and to property. *Id.* at 107.

We are a nation of drivers. Unfortunately, we are also a nation of drinkers. As the Supreme Court has observed:

> The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court ... has repeatedly lamented the tragedy. See *Breithaupt v. Abram,* 352 U.S. 432, 439 [77 S.Ct. 408, 412, 1 L.Ed.2d 448] (1957) ("The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield"); *Tate v. Short,* 401 U.S. 395, 401 [91 S.Ct. 668, 672, 28 L.Ed.2d 130] (1971) (BLACKMUN, J., concurring) (deploring "traffic irresponsibility and the frightful carnage it spews upon our highways"); *Perez v. Campbell,* 402 U.S. 637, 657, 672 [91 S.Ct. 1704, 1715, 1722, 29 L.Ed.2d 233] (1971) (BLACKMUN, J., concurring) (footnote omitted) ("The slaughter on the highways of this Nation exceeds the death toll of all our wars"); *Mackey v. Montrym,* 443 U.S. 1, 17–19 [99 S.Ct. 2612, 2620–2621, 61 L.Ed.2d 321] (1979)

**8.** The regulation provides:

> The Director is authorized, after giving notice and an opportunity for hearing, to suspend or revoke the license of any person upon a showing, by records or other sufficient evidence, of any of the grounds for suspension or revocation set forth in this chapter.

**9.** The conviction also subjects these drivers to criminal penalties:

> No individual shall, while under the influence of any intoxicating liquor or narcotic drug, operate any vehicle in the District. Any individual violating any provision of this sub-section shall upon conviction for the 1st offense be fined not more than $500 or imprisoned not more than 6 months, or both; and upon conviction for the 2nd or any subsequent offense be fined not more than $1,000 or imprisoned not more than 1 year, or both.

**10.** The revocation in *Bungardeanu* was performed pursuant to an administrative regulation adopted under D.C.Code § 40–302 (1961), which, like its current counterpart, allowed the Bureau to revoke operators' permits for cause.

(recognizing the "compelling interest in highway safety").

*South Dakota v. Neville, supra,* 459 U.S. at 558–59, 103 S.Ct. at 919–20 (1983). These considerations are at least as important today as they were at the time of our decision in *Bungardeanu.* Petitioner's assertion that the authority of the Bureau of Motor Vehicle Services has been reduced by amendments to the District of Columbia Code enacted subsequent to the *Bungardeanu* decision is without foundation and does not merit discussion.[11]

## C

Petitioner also claims that she was prejudiced by the personal bias of the hearing examiner. After the initial show cause hearing, Stowell filed with the Bureau an application to depose two police officers. 18 DCMR § 1021.1. The application was granted, and the deposition scheduled for September 18, 1984.

The deposition began as planned. However, when one of the officers stated that he needed a copy of the PD–119[12] to refresh his memory, the hearing examiner recessed the deposition so that the officer could obtain the form. When the deposition was reconvened, the hearing examiner stated that he was halting the deposition at that point on the advice of the Office of Corporation Counsel. It is this consultation that is the basis of Stowell's allegation of bias.

 Petitioner did not raise this claim before the agency at any time. As a general rule this court does not entertain claims that are first raised at the appellate level. *See, e.g., Quality Management, Inc. v. District of Columbia Rental Housing Commission,* 505 A.2d 73, 75 n. 2 (D.C. 1986); *Smith v. Police & Firemen's Retirement & Relief Board,* 460 A.2d 997, 999 (D.C.1983); *John D. Neumann Properties, Inc. v. District of Columbia Board of Appeals & Review,* 268 A.2d 605, 606 (D.C.1970). To do so here would be to usurp the function of the agency because we would deprive the Bureau of Motor Vehicle Services "'of an opportunity to consider the matter, make its ruling and state the reasons for its action.'" *Dietrich v. District of Columbia Board of Zoning Adjustment,* 320 A.2d 282, 287 (D.C.1974) (quoting *Unemployment Compensation Commission v. Aragan,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946)).

Moreover, such intervention in the normal process is particularly inappropriate in this case where the published rules of the agency specify the procedure to obtain relief and recite the consequences of ignoring that procedure. Those regulations explain that "[a]ny party desiring that an examiner disqualify himself from participating in a decision [should] file a motion supported by an affidavit setting forth the grounds for such disqualification." 18 DCMR 1019.1; *see also id.* at § 1006.5. Section 1019.2 provides that failure to file a timely motion to disqualify an examiner operates as a waiver. *Id.* at § 1019.2. Petitioner Stowell never filed such a motion. Therefore, we do not address this claim.[13]

## D

Stowell asserts that the hearing examiner erred when he refused to issue a subpoena to compel the testimony of Officer Milton James at the final show cause hearing. Both Officer Hodge and Officer Williams

---

11. The amendments to which petitioner refers are portions of a chapter added to the District of Columbia Code in 1978. D.C.Code § 40–601 (1981). The changes were designed to *increase* the power of the District of Columbia Department of Transportation (of which the Bureau of Motor Vehicle Services is a part) and to decriminalize some traffic offenses. *Id.* Clearly, there was no intention to diminish pre-existing agency authority.

12. This is the document used by the Metropolitan Police Department to record witness statements.

13. We do note, however, that the consultation about which Stowell complains may not have been improper. *Cf. Mendota Apartments v. District of Columbia Comm'n on Human Rights,* 315 A.2d 832, 836 (D.C.1974).

testified that James had been present at the stationhouse during Stowell's processing, and had signed a document indicating that he had served on petitioner the notice of proposed suspension. Petitioner's counsel avers that James also witnessed Stowell's signature on the *Miranda* warning, a form that the Metropolitan Police Department designates PD–47.[14]

Because Stowell believed that James' testimony was necessary to unravel the tangled skein of events at the stationhouse, she sought to depose him and Hodge before the second hearing. She was permitted to do so, but although the officers appeared at the scheduled time and place, they brought no documents. Counsel for petitioner complained, and referred the hearing examiner to the regulation that authorized him to subpoena witnesses. The hearing examiner replied that "[I]n this matter the officers shall be subpoenaed by the respondent ... [because] the Corporation Counsel's office [stated] that they were not going to release the germane records to these officers without subpoena from your office." As a result of the hearing examiner's conclusion that he was not empowered to issue subpoenas, James never testified.

Contrary to the belief expressed by the hearing examiner, he did have the power to issue subpoenas. *See* 18 DCMR §§ 1006.-2(d), 1020.1 (authority of hearing examiner to subpoena witnesses). The regulations make clear that decisions about whether to issue subpoenas are committed to the discretion of Bureau officials. *Id.* § 1020.1 ("Subpoenas ... may be issued by the examiner ... or ... by the Chief Examiner or the Director, upon application by a party to the proceeding."); *Id.* § 1020.6 ("Where it appears that the testimony of a witness or documentary evidence is relevant to the issues in a proceeding, the examiner or Chief Examiner may issue on his own motion a subpoena requiring such witness to attend and testify or requiring the production of such documentary evidence.").

14. This document is not part of the record be-

■ In this case, because the hearing examiner was unaware of the regulations he was charged with administering, he did not exercise discretion. Failure to choose a course of action in a situation calling for such a choice to be made is an abuse of discretion. *Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979). This is so, because whether the failure to choose results from ignorance of the right to make the choice or mere intransigence, it assumes the existence of a rule that admits of but one answer to the question presented. *Id.* Although our reversal of that portion of the decision relating to petitioner's refusal to be tested for alcohol does not rest on this conclusion, we note that the inaction of the hearing examiner was an abuse of discretion.

### IV

■ After reviewing the entire record, we affirm the finding of the Bureau that petitioner did operate a motor vehicle while under the influence of intoxicating liquor. That finding, properly made, authorizes the Bureau of Motor Vehicle Services to revoke the drivers's license of the petitioner for a period of six months. 18 DCMR § 302.5.

■ We are not persuaded, however, that the conclusion of the Bureau concerning Stowell's refusal to be tested is based on adequate findings flowing from substantial evidence. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable man might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). The evidence in the record before us about events after petitioner Stowell arrived at the precinct is so confusing and contradictory as to be inconclusive on that issue.

Because there was no substantial evidence to support the finding that Stowell refused the test after being properly re-

fore us.

quested to submit by an officer of the law, we vacate that portion of the decision. Consequently a revocation for the period of twelve months cannot stand.

*Affirmed in part, reversed in part and remanded for proceedings not inconsistent with the opinion.*

NEWMAN, Associate Judge, dissenting:

Since I am satisfied on this record that Ms. Stowell was denied the basic fundamentals of due process, I dissent.