**Clarence Lee PARKS, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–83–0309–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 2, 1984.

David Ball, Jr., Houston, for appellant.

Winston E. Cochran, Jr., Houston, for appellee.

Before EVANS, C.J., and DOYLE and LEVY, JJ.

**OPINION**

EVANS, Chief Justice.

A jury convicted the appellant of driving while intoxicated, and the court assessed his punishment at 90 days confinement, probated, and a $350 fine.

In three grounds of error the appellant contends that the trial court committed reversible error in allowing the State, over appellant's objection, to elicit testimony that appellant had been offered and had refused to submit to a chemical breath test, and that in the absence of such testimony, the evidence is insufficient to support the conviction.

Two highway patrol officers testified that they first observed the appellant driving southbound on State Highway 6 about 8:15 p.m. on October 21, 1982. The officers, driving northbound on the highway, said that as they approached appellant's vehicle, it appeared to be traveling at an excessive rate of speed. Their radar indicated a speed of 71 m.p.h. The officers made a u-turn and they followed the appel-

lant's vehicle for approximately one-quarter mile. During that time, they observed appellant's vehicle weave across the lines marking off the highway lanes. When the officers were within ten to fifteen yards of the appellant's vehicle, they turned on their overhead lights, but the appellant's vehicle continued on for about one-half mile before stopping.

One of the officers asked the appellant to step out and to approach the rear of his vehicle. As the appellant walked to the rear, both officers noticed that he was taking "very deliberate steps," indicating the possibility of intoxication. The appellant was asked for his driver's license, and he opened his wallet in an attempt to produce it. However, the officer noted, appellant passed over his license several times, and eventually handed the officer a Gulf Oil Company credit card. When the officer advised appellant of the mistake, he then located his license and also produced an identification card issued by the Clerk of the Texas Supreme Court, reflecting his status as a court reporter. According to the officers' testimony, the appellant's eyes were "glassy and glazed over" and emanating from his breath was a "strong odor" of alcoholic beverage. The officers testified that they did not notice anything unusual about appellant's manner of speech, but both officers stated that, in their opinion, the appellant was intoxicated.

The appellant denied that he was intoxicated, and said that he had met his wife at the U.S. Bar & Grill in Houston about 4:30 p.m. that afternoon. He testified that he had only two Irish coffees at the restaurant and that while there, he ate some seafood and had a number of cups of plain coffee. Appellant's wife confirmed his testimony as to the number of drinks he had at the restaurant, and she also testified that an enduring garlic odor also resulted from the type of meal he had consumed that evening. A friend of the appellant and his wife, and two employees at the restaurant, also confirmed the appellant's testimony concerning the number of drinks he had consumed, and all defense witnesses stated that, in their opinion, the appellant

was not intoxicated when he left the restaurant. The appellant explained his mistake in handing the officer a Gulf credit card, saying that a few minutes prior to his arrest, he had charged gasoline on his Gulf credit card and then placed the card in his wallet at the place where he usually kept his driver's license.

The State did not mention the appellant's refusal to take a breath test during its direct examination of the first officer to testify. On cross-examination, appellant's counsel made a request to see the documents to which the officer had been referring during the course of giving his testimony. With regard to these documents, he asked the officer, "What is the yellow sheet?" The officer replied, "It's a breath test refusal."

The second arresting officer testified that appellant had not been read his *Miranda* rights. He additionally testified, over appellant's objections, that appellant was advised when arrested that he would be asked to take a breath test, and that if he refused he could lose his license for a year. The witness stated that to his knowledge, appellant had not taken the breath test.

The record indicates that appellant himself opened the door to the State's proof that he did, in fact, refuse to take the test. *See, Ashford v. State,* 658 S.W.2d 216 (Tex. App.—Texarkana 1983, no writ); *Sutton v. State,* 548 S.W.2d 720 (Tex.Cr.App.1977). However, we need not decide the case on that basis because we hold that evidence of such refusal was admissible as part of the State's direct evidence.

In *South Dakota v. Neville,* —— U.S. ——, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), the United States Supreme Court held that a suspect's "refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination." Two Texas Courts of Appeals decisions, following the U.S. Supreme Court's holding in *South Dakota v. Neville,* held that evi-

dence of a defendant's refusal to submit to a blood-alcohol test, after a lawful request by a police officer, is admissible at trial when intoxication is an issue. *Ashford v. State, supra; Gressett v. State,* No. 05-82-0493-CR (Tex.App.—Dallas, July 14, 1983, no writ) (not yet reported). In those cases, the defendant contended, as does the appellant here, that notwithstanding the U.S. Supreme Court's decision in *Neville,* the constitution and laws of Texas still prohibit evidence of a defendant's refusal to take a breath test in a driving while intoxicated trial. In support of this position, the appellant points out that the state statute in *Neville* specifically authorized the admission of the defendant's refusal, while the Texas statutes contain no such provision. Thus, the appellant argues, the admission of such evidence is precluded under our state laws as decided in *Dudley v. State,* 548 S.W.2d 706 (Tex.Cr.App.1977); and *Cardwell v. State,* 156 Tex.Cr.R. 457, 243 S.W.2d 702 (1951). The underlying basis of the appellant's argument in this respect is that the admission of such evidence violates the provisions of Tex.Crim.Proc.Code Ann. art. 38.22, sec. 3 (Vernon's Supp.1982-83) which prohibits evidence of oral statements or other communicative acts if made while under arrest that are incriminating in nature.

█ We conclude, as did the Texarkana Court of Appeals in *Ashford,* and the Dallas Court of Appeals in *Gressett,* that the applicable provisions of art. 38.22 are substantially the same in scope as the Fifth Amendment right against incrimination, and that the provisions of the Texas Constitution and statute provide no broader protection in this respect than the provisions of the U.S. Constitution. Thus, following the rationale of these decisions, we hold that the evidence of the appellant's refusal to submit to a breath test was admissible, and that *Miranda* and art. 38.22 warnings were not required to be given the appellant before asking if he would submit to a breath test.

The trial court's judgment is affirmed.

DOYLE, J., participating.

LEVY, J., dissenting.

LEVY, Justice, dissenting.

By its majority opinion today, the Court has unnecessarily sanctioned the "intolerable anomaly" and "split in two" the rule of refusal by silence conceived by the Court of Criminal Appeals in *Dudley v. State,* 548 S.W.2d 706, 712 (Tex.Cr.App.1977). The Court there so characterized the situation where "... an accused's exercise of his constitutional right to remain silent, of which he must be informed before *any* questioning by law enforcement officials concerning the offense for which he was arrested, could thus be turned against him."

Heretofore, Art. 38.22, V.A.A.C.P., the "confession statute," has been consistently construed by the Court of Criminal Appeals as prohibiting proof of an accused's *oral* statements, silence, or acts, if made while under arrest and tending to communicate incriminating thoughts of an accused. *Garner v. State,* 464 S.W.2d 111 (Tex.Cr. App.1971); *Butler v. State,* 493 S.W.2d 190 (Tex.Cr.App.1973); *Hubbard v. State,* 153 Tex.Cr.R. 143, 217 S.W.2d 1019 (1949); *Brent v. State,* 89 Tex.Cr.R. 544, 232 S.W. 845 (1921). Analogous to the Fifth Amendment of the federal Constitution, it nevertheless constitutes an adequate and independent *State* ground[1] to forbid compulsory revelation of an accused's thoughts or mental processes whether by speech, by act, or by omission thereof.

Indeed, the Fifth Amendment has been construed to be no obstacle to the admissibility of oral confessions, so long as they are voluntary and in compliance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *entire* basis of art. 38.22, in contrast, is to prevent

---

1. "[W]e will not review a judgment of a state court that rests on an adequate and independent state ground. Nor will we review one until the fact that it does not do so appears of record." *Herb v. Pitcairn,* 324 U.S. 117, 128, 65 S.Ct. 459, 464, 89 L.Ed. 789 (1945).

the admission of oral confessions *except under precisely delineated situations.* In characterizing art. 38.22 as "substantially the same as the Fifth Amendment," the majority ignores the history, language, and purpose of the statute, which accords a much broader protection of oral confessions than the Fifth Amendment. Our state statute is thus not a mere shadow of the comparable Fifth Amendment and no matter how eloquent or persuasive its analysis of the federal constitution may be, the United States Supreme Court will not presume that the Court of Criminal Appeals will modify its interpretation of Texas law whenever the Supreme Court interprets comparable federal law differently. *See South Dakota v. Neville,* —— U.S. ——, 103 S.Ct. 916, 74 L.Ed.2d 748 (dissenting opinion 103 S.Ct. at 925).

Even when a state court may misconceive federal law, the United States Supreme Court cannot vacate the state court's judgment merely to give it an unsolicited opportunity to reanalyze *its own law.* If a state court judgment is premised on an adequate state ground, that ground must be presumed *independent* unless the state court suggests otherwise.

18 U.S.C. § 3231 shows a Congressional intent *not* to supercede state criminal statutes by any provision of Title 18, which codifies federal criminal law:

> Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several states under the laws thereof.

States may provide concurrent legislation in the absence of explicit congressional intent to the contrary. *Sexton v. California,* 189 U.S. 319, 324–25, 23 S.Ct. 543, 545, 47 L.Ed. 833 (1903). It would appear that art. 38.22 is "concurrent legislation" quite compatible with federal constitutional notions concerning the privilege against self-incrimination, and the *Dudley* holding should therefore be understood to be *not* dependent on the United States Supreme Court's view of federal law. Thus, the heavy majority reliance on *South Dakota v. Neville* is unjustified. It is interesting to note that the South Dakota legislature specifically enacted a statute, contrary to Texas policy, providing that refusal to submit to a blood-alcohol test (or a urine, breath, or "bodily substance" test) "may be admissible into evidence at the trial." S.D.Comp.Laws 32–23–10.1.[2]

As stated in *Dudley, supra,* through the concurring opinion of Judge Onion, the court's decisions prohibiting the State from eliciting testimony concerning an accused's refusal to take a sobriety test have rested upon the confession statute as well as the rule of evidence which forbids an accused's silence to be used against him as tending to establish guilt.

The privilege against self-incrimination was earned by our forefathers only through much blood and agony. The reasons for its inclusion in the federal constitution—and the necessities for its preservation—are to be found in the lessons of history. As early as 1650, remembrance of the horror of Star Chamber proceedings a decade before had firmly established the privilege in the common law of England. Transplanted to this country as part of our legal heritage, it soon made its way into various state constitutions and ultimately, in 1791, into the federal Bill of Rights. The privilege was generally regarded then, as now, as a privilege of great value, a protection to the innocent though a shelter to the guilty, and a safeguard against heedless, unfounded, or tyrannical prosecutions. *Twining v. New Jersey,* 211 U.S. 78, 91, 29 S.Ct. 14, 16, 53 L.Ed. 97 (1908); *Boyd v. U.S.,* 116 U.S. 616, 631–32, 6 S.Ct. 524, 532–33, 29 L.Ed. 746 (1886). Coequally with our other constitutional guarantees, the self-incrimination clause must be accorded liberal construction in favor of the right it was intended to secure. Such liberal construction is particularly warranted in

---

**2.** Our new statute, art. 6701*l*–5 (enacted after the offense alleged herein had occurred), authorizes the admissibility at trial of a refusal to be tested, but apparently nothing therein attempts to deny the efficacy or applicability of art. 38.-22, and a possible conflict is yet to be adjudicated.

a prosecution of a witness who refuses to submit to a test designed to facilitate his conviction, since the respect normally accorded the privilege is then buttressed by the presumption of innocence accorded to a defendant in a criminal trial. To apply the privilege narrowly or begrudgingly—to treat it as a historical relic, at most merely to be tolerated—is to ignore its development and purpose. Time has not shown that protection from the evils against which this privilege was directed is needless or unwarranted. Those who too readily assume that an accused who invokes the privilege is guilty of crime do scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying states. The founders of this nation were not naive or neglectful of the interests of justice. Because the dignity and conscience of man were involved, the founders created the federally protected right of silence and decreed that the law could not be used to pry open one's lips and make him a witness against himself. The privilege against self-incrimination is a specific provision of which it is peculiarly true that "a page of history is worth a volume of logic."

If one believes, as I do, that the privilege against self-incrimination is one of the great landmarks in man's struggle to make himself civilized, it follows that the privilege places the right of silence *beyond the reach of government:* the privilege rightfully stands between the citizen and his government. In recent legal history, we have witnessed in other states the erosion of the privilege by judicial sanctioning of compulsory extraction of a blood sample, *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and cases therein cited, or a compulsory urine or breath sample, and in Texas we have witnessed a partial dilution of the privilege by the qualification that it applies only to "testimonial communications," but not to "real" or "physical" evidence, *Olson v. State,* 484 S.W.2d 756 (Tex.Cr.App.1972).

Such cases have followed, in time but not in principle, the holding of the Court of Criminal Appeals which declared in *Card-*

*well v. State,* 156 Tex.Cr.R. 457, 243 S.W.2d 702 (1951):

> The State cannot avail itself of the silence or refusal of an accused prisoner as a circumstance tending to establish his guilt.

Under *Miranda v. Arizona, supra,* it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation, and the prosecution may not use at trial the fact that he stood mute or claimed his privilege in the face of accusation. Implicit in the *Miranda* warning that an accused may constitutionally remain silent is the assurance that such silence will carry no penalty. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 48 L.Ed.2d 91 (1976).

It is blatantly illogical to maintain that a refusal *by silence* to take a chemical test cannot be used, but where the police compel a *verbal* refusal—a "testimonial communication"—such refusal can be shown. It is also unfair, because it enables the State to achieve indirectly by innuendo what it was prevented by law from accomplishing directly. In my view, the probative value of a refusal to take a chemical test for intoxication is much too low in comparison to its generally prejudicial effect upon the defendant.

When a police officer is permitted to testify that an accused has exercised his right of refusal or his right of silence, the accused is discredited before the jury, which is precisely what the self-incrimination statute prohibits. The privilege against self-incrimination is thereby belittled and further eroded, not only diminishing the efficacy of the privilege but portending ever further extensions.

As the *Dudley* court stated, through the concurring opinion of Judge Onion at 715, when a defendant verbally refuses to submit to a chemical test for intoxication, he is testifying against himself and this is clearly "testimonial evidence." I would hold that evidence of refusal is a by-product of the compulsion to take the test, testimonial

in nature, and constitutes compulsory self-incrimination in violation of art. 38.22.

For these reasons, and because of my fear that ingenious casuistry will further relegate the privilege against self-incrimination to a second-rate position, rather than the preferred status it deserves, I respectfully dissent and would reverse the judgment of conviction.