**Johnnie Lee DENNIS, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 07-85-0183-CR.**

Court of Appeals of Texas,
Amarillo.

Feb. 23, 1987.

Discretionary Review Refused
May 20, 1987.

Pamela C. Oglesby, Amarillo, for appellant.

Randall L. Sherrod, Dist. Atty., Canyon, for appellee.

Before DODSON, COUNTISS and BOYD, JJ.

BOYD, Justice.

Appellant Johnnie Lee Dennis appeals his conviction of involuntary manslaughter and the consequent court-assessed punishment, enhanced by prior convictions, of thirty years confinement in the Department of Corrections. We affirm that conviction.

In two grounds of error,[1] appellant contends that (1) the evidence was insufficient to establish that he was the driver of the vehicle, and (2) the trial court erred in admitting evidence of appellant's refusal to voluntarily submit to a blood test.

In pertinent part, it was alleged in the indictment that on or about September 27, 1984, appellant did then and there "by accident and mistake when operating a motor vehicle while intoxicated, and by reason of such intoxication, cause the death of an individual, to-wit: Doretta Jobe, by driving said motor vehicle in which the said Doretta Jobe was a passenger into another vehicle...."

Since appellant's attack mandates a consideration of pertinent evidence, it is necessary to recite the litany of rules by which we must judge the sufficiency of that evidence. In determining whether the evidence is sufficient to support a conviction for a charged offense, the applicable standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

---

**1.** Although, since September 1, 1986, the proper designation of appellant's contentions would be points of error, Tex.R.App.Proc. 74(d), his termi- nology was correct at the time of the filing of his brief. We will use the same terminology in our opinion.

the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See also Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984); *Wilson v. State*, 654 S.W.2d 465, 471 (Tex.Crim.App.1983) (opinion on motion for rehearing). That standard is the same in both direct and circumstantial evidence cases, and in making its review, an appellate court will look at all of the evidence in a light most favorable to the verdict or judgment. *Houston v. State*, 663 S.W.2d at 456. *See also Hankins v. State*, 646 S.W.2d 191, 199 (Tex. Crim.App.1983) (opinion on motion for rehearing).

The jury is the sole judge of the credibility of the witnesses and may accept or reject any part or all of the testimony given by State or defense witnesses. *Johnson v. State*, 571 S.W.2d 170, 173 (Tex.Crim.App. 1978). It is not necessary that every fact directly and independently point to the accused's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Thompson v. State*, 563 S.W.2d 247, 250 (Tex.Crim.App.1978); *Flores v. State*, 551 S.W.2d 364, 367 (Tex. Crim.App.1977); *Martinez v. State*, 699 S.W.2d 910, 914 (Tex.App.—Amarillo 1985, no pet.).

■ Phillip Lloyd Goodson, a college student, testified that he was driving to Amarillo on the Canyon Expressway on September 27, 1984. It was misting and the road was wet, but not slick. At about 10:00 p.m., Goodson was near the McCormick Road overpass when he observed a car swerve in the opposite lane. Although he slowed his rate of speed, the car came from the opposite lane across a grassy median and struck his vehicle.

Cynthia Noble was riding in a car with Sharra Bush. As they were traveling toward Canyon, she saw a white El Camino swerving from shoulder to shoulder of the highway. That El Camino suddenly went across the grassy median and hit a brown El Camino traveling toward Amarillo. When she and Bush stopped the car, they went to, and were the first to arrive at, the scene of the accident. After briefly assisting Goodson, Noble went to the other vehicle, in which she saw appellant and a female. Although Noble did not see who was driving the white El Camino, she said appellant was sitting behind the steering wheel "moaning and groaning very loudly." She also observed a female in the floorboard. That woman's head and shoulders were at appellant's feet and her feet were on the passenger side of the floorboard. Although Noble was not certain, she said, "[I]t seems like I remember seeing a lady in the passenger's side" of the white El Camino.

Bush testified that the car door had already been opened when she saw the people in the white El Camino and her observations were made at a distance of about ten feet. She said that the man was towards the middle, but was not directly behind the wheel, while the woman was in the floorboard with her head on the driver's side and hanging out about six inches.

Elaine Vinyard was driving to Amarillo when she saw two vehicles that had already collided. When she stopped and got out of her vehicle, some people were helping the man in the brown El Camino and convinced him to rest on the ground. Vinyard assisted the man on the ground and then went to the white El Camino. There, she saw a woman in the floorboard with her shoulder under the steering wheel and her body extended across the floorboard. The lady's hips and feet were on the passenger side. She said that the man was near the middle of his car, closer to the driver's side but partially between twisted bucket seats with his feet extended toward the driver's door and under the woman. Vinyard also said that the man asked, "Do we have to have the cops?" When told that they had been called, he exclaimed, "Oh, God, we don't need the cops, let's don't have the cops." Apparently speaking to the woman in the floorboard, "probably three or four times" the man said, "You have got to get up, we have got to get out of here." Vinyard identified appellant as the man she saw at the scene.

Roger Short and David Thurman, Randall County deputies, and Vinyard all testified that appellant was intoxicated. Thurman testified that he arrived at the accident after a number of people had already gathered at the scene. The front seats were not bolted to the floor of the white car and it looked as if the seats had been placed in the white car from another vehicle. He said that appellant was seated behind the steering wheel "with a white female laying across his legs." Deputy Short said that when he arrived, which was after Deputy Thurman, appellant was seated to the right of the steering column with one hip in the driver's seat and his feet angled into the driver's floorboard.

Eddie Shoumake, who was called by the defense, testified that he was traveling north when a brown El Camino passed him. A few seconds later, the cars collided and he stopped. After briefly assisting the man in the brown car, Shoumake went to the white El Camino and saw a man wedged between the bucket seats with a woman "laying across him" with her head hanging out the driver's door. The lady's feet were by the passenger door. Shoumake testified that he believed that the woman was driving, based upon the position of the man and woman. However, in a statement made at the accident scene, he said that the driver of that car was a white man in his early forties. Shoumake said he could not read or write and his statement was filled out by "this colored boy that was with me."

Bruce Wayne Mitchell, called by the state upon its rebuttal, said he was a passenger in Shoumake's car. He opened the door to the wrecked El Camino and saw that the man had half of his left hip in the driver's seat. At that time, the man was in an upright position with one foot under the passenger side of the dashboard and the other foot on the hump. Mitchell was the one who transcribed Shoumake's statement, and he testified that he wrote it just as it was told to him.

Pat Donley, the defendant's expert accident reconstructionist, examined many of the exhibits and medical reports of the injuries sustained by the appellant and the deceased. Based on the location of the appellant's and decedent's injuries, the wrecked vehicle, and a number of other exhibits, Donley testified that "the injuries would have been more logically sustained" if the deceased woman was on the driver's side and appellant on the passenger's side at the time of the collision.

Ralph Erdmann, a forensic pathologist, testified that he had been trained in accident reconstruction by the F.B.I., and worked in that field for about a year and a half. From his examination of the decedent's injuries, reports of appellant's injuries, photographs of the accident, and the positions of appellant and decedent after the accident, he concluded that appellant was the driver and the decedent was a passenger of the vehicle.

In summary, Noble testified that appellant was directly behind the steering wheel in an upright position shortly after the accident. Although he was uncertain, Noble "thought" the woman was on the passenger side of the white car. Bush testified that the man was not directly behind the wheel, but was more toward the middle. Vinyard said that the man was partially between the seats of the car, but closer to the driver's side. She also said that the man was very concerned about contacting the police and expressed an intention to leave the scene of the accident. Noble, Vinyard, and Bush agreed that the deceased's head was under the steering wheel and that her legs were on the passenger side of the floorboard. Vinyard also said that the deceased's hips were on the passenger side. Dr. Ralph Erdmann's expert opinion was that appellant was on the driver's side and that the deceased was on the passenger's side when the cars collided. Viewing this evidence in the light most favorable to the prosecution, we find that a rational trier of fact (the jury) could have found beyond a reasonable doubt that appellant was driving the vehicle occupied by himself and the deceased woman.

Appellant here, for the first time, also argues that Ralph Erdmann's opinion was not based on all of the relevant facts in

evidence, and hence, was subject to objection. It is axiomatic that in absence of a timely objection at trial, error related to the examination of witnesses or admission of evidence is not preserved for appellate review. *Crocker v. State,* 573 S.W.2d 190, 205 (Tex.Crim.App.1978); *Lejeune v. State,* 538 S.W.2d 775, 780 (Tex.Crim.App.1976); *Thomas v. State,* 530 S.W.2d 834, 837 (Tex. Crim.App.1975). Ground of error one is overruled.

In his second ground of error, appellant contends that the trial court erred in admitting evidence of appellant's refusal to voluntarily submit to a blood test.

Brad Parker, a highway patrolman, arrived at the accident scene after the decedent had been removed from the car. However, appellant was still in the car, and, Parker said, appellant's legs were under the left side of the dash. He then went to Northwest Texas Hospital in Amarillo, where appellant was transported, to see him.

After this testimony of Parker, a hearing was conducted outside the presence of the jury for the purpose of reviewing his proposed testimony, and considerable evidence was adduced at that hearing. Appellant's counsel objected to Parker's testimony as to appellant's refusal to voluntarily submit to a blood test "for the reason that he was under arrest and he wasn't read his rights" and that it was hearsay. Without any definitive ruling from the trial judge, the jury was returned to the courtroom.

After the testimony resumed in the presence of the jury, Parker testified that he requested that appellant voluntarily give a specimen of his blood for testing. When Parker was asked to give appellant's reply to that question, defense counsel objected "on the grounds that we previously stated, custodial interrogation." That objection was overruled and Parker was permitted to testify that appellant refused to give the specimen.

In argument under this ground, appellant says that Parker's testimony as to his refusal was improperly admitted "due to the fact that Appellant was never advised of his rights or given a warning orally or in writing" prior to his refusal. The vice in this, he says, was that he was "not allowed to make an informed and enlightened decision concerning the possible consequences of such refusal." The basis of appellant's argument must be that if appellant had received his *Miranda* warnings he could have concluded that his refusal could be received into evidence against him and, not knowing that fact, he could not have made an informed and enlightened decision to accept or refuse the blood test. We disagree with that premise.

■ As appellant recognizes, the United States Supreme Court in *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), held that admission of a defendant's refusal to voluntarily submit to a blood-alcohol test is admissible at trial. En route to that decision, the Court noted its prior holding in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), that a blood test was "physical or real" evidence and was, therefore, unprotected since the Fifth Amendment only prohibited a State from compelling "communications" or "testimony." *Id.* at 559, 103 S.Ct. at 920. Since, the Court reasoned, the "coercion requirement comes directly from the constitutional language directing that no person 'shall be *compelled* in any criminal case to be a witness against himself,'" *South Dakota v. Neville,* 459 U.S. at 562, 103 S.Ct. at 922, and since defendant had been given a choice of submitting to or refusing the test, the State did not directly compel a refusal. Therefore, evidence of the defendant's voluntary refusal is admissible and does not amount to compelled self-incrimination. *Id.* at 562–64, 103 S.Ct. at 921–22. Significantly, the Court observed that the admission of such evidence "even though respondent was not specifically warned that this could be used against him" was not fundamentally unfair. *Id.* at 565, 103 S.Ct. at 923. The Court also noted that a defendant's "choice of refusal thus enjoys no prophylactic Miranda protection outside the basic Fifth Amendment protection." *Id.* at 564 n. 15, 103 S.Ct. at 923 n. 15. The clear teaching of this case is that since evidence of a

refusal of a blood test offer does not constitute constitutionally prohibited self-incrimination, there is no privilege appurtenant to the refusal, hence, no *Miranda* warnings prior to that refusal are constitutionally required.

In *Gressett v. State*, 669 S.W.2d 748 (Tex.App.—Dallas 1983) *aff'd*, 723 S.W.2d 695 (Tex.Crim.App.1986), in a well-reasoned opinion, the Court had occasion to explicate the *Neville* decision in its application in this State. The Court noted the prior state court holding that Texas Constitutional provisions as to self-incrimination have been held to be no broader in scope than the federal right under the Fifth Amendment. *Olson v. State*, 484 S.W.2d 756, 772 (Tex.Crim.App.1969) (opinion on motion for rehearing). Therefore, the Court reasoned, the rationale of the United States Supreme Court in *Neville* is viable and applicable in Texas. We agree with and adopt that holding.

While appellant attempts to distinguish the *Gressett* decision in that Gressett was not under arrest at the time he refused the test and appellant was under arrest, we cannot agree with that distinction. The clear import of the *Neville* decision is that a refusal of a blood test offer is not within the purview of a constitutional prohibition against coerced self-incrimination. A necessary corollary to that holding is that, under the Fifth Amendment to the United States Constitution, there is no privilege appurtenant to the refusal of a blood test, hence no warning prior to that refusal is necessary. Tex. Const. art. I, § 10, our state equivalent of the federal Fifth Amendment, was intended to provide the citizens of this state with protection similar to that afforded by the Fifth Amendment. It is true that federal decisions as to application of federal constitutional standards do establish only a minimum standard for state courts and those courts are not limited to those standards in their construction of applicable state standards. However, as we noted, we are instructed by the Court in

*Olson v. State*, 484 S.W.2d at 772, that Tex. Const. art. I § 10, our state equivalent of the federal Fifth Amendment, was intended to provide the citizens of this State "with a safeguard similar to that contained in the Fifth Amendment." We, therefore, find the rationale and reasoning of the *Neville* Court to be applicable in this case. Since appellant was given a choice to either accept or refuse the lawful request of the police officer, the admission into evidence violates neither the Fifth Amendment to the United States Constitution or article I, section 10 of the state constitution. *See also State v. Thomas*, 723 S.W.2d 696 (Tex. Crim.App.1986); *McGinty v. State*, 723 S.W.2d 719 (Tex.Crim.App.1986). It naturally follows that the failure to give *Miranda* warnings prior to that refusal, even if the defendant was under arrest at that time, would not prevent the receipt of that refusal into evidence. *Cf. Parks v. State*, 666 S.W.2d 597 (Tex.App.—Houston [1st Dist.] 1984, no pet.).

Appellant, for the first time upon appeal, also complains that the officer failed to give appellant the statutory warnings required by Tex.Rev.Civ.Stat.Ann. § 67011–5, § 2(b) (Vernon Pamp.Supp.1987). Since appellant's trial objection did not include this contention, it is at variance with his appellate objection. Hence, nothing is preserved on that basis for our review.[2] *Carrillo v. State*, 591 S.W.2d 876, 892 (Tex.Crim.App. 1979). Ground of error two is overruled.

In summary, all of appellant's objections are overruled and, there being no reversible error, the trial court's judgment is affirmed.

**2.** Parenthetically, we note that chemist Roy Murphy testified, without objection, as to the results of a blood test obtained by virtue of this statute which showed appellant's blood contained .17 percent alcohol by weight.