Troy A. ARMSTRONG, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–96–0441–CR.

Court of Appeals of Texas,
Amarillo.

Nov. 26, 1997.

David T. Duncan, Jr., Lubbock, for appellant.

William C. Sowder, Crim. Dist. Atty., Chad Meacham, Appellate Chief, Lubbock, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

BOYD, Chief Justice.

In four points of error, appellant Troy A. Armstrong argues that his murder conviction and life sentence must be reversed. In his first two points, appellant argues that his conviction violates the Fourteenth Amendment of the United States Constitution, article 38.03 of the Texas Code of Criminal Procedure and section 2.01 of the Texas Penal Code because the evidence is legally insufficient to prove each element of the offense beyond a reasonable doubt. In his third point, he asserts that the evidence is factual-

ly insufficient to prove each element of the offense in violation of article 38.03 of the Texas Code of Criminal Procedure and section 2.01 of the Texas Penal Code. Finally, in his fourth point, he posits that the State failed to disclose evidence favorable to appellant in violation of the Fourteenth Amendment of the United States Constitution. Overruling his challenges, we affirm his conviction.

In his first two points, appellant argues that the State did not prove beyond a reasonable doubt that first, the murder weapon, as described in the indictment and in the charge, was unknown to the grand jury, and second, that the victim's death was caused by a stabbing. In relevant part, the trial jury was charged:

> Now bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about the 24th day of July, 1992, in Lubbock County, Texas, as alleged in the indictment, the defendant, TROY A. ARMSTRONG, did then and there intentionally or knowingly cause the death of an individual, Belynda Tillery, by stabbing the said Belynda Tillery with a deadly weapon, to-wit: an object unknown to the grand jury, that in the manner of its use or intended use was capable of causing death or serious bodily injury; or did then and there commit an act clearly dangerous to human life, to-wit: stabbing the said Belynda Tillery with a deadly weapon, to-wit: an object unknown to the grand jury, that in the manner of its use or intended use was capable of causing death or serious bodily injury, thereby causing the death of the said Belynda Tillery, then you will find the defendant guilty of the offense of murder and so say by your verdict.

In his first legal sufficiency challenge, appellant, showing that the State did not meet its burden, points to the rule that if an indictment alleges that the deceased was killed by some means, instrument or weapon unknown to the grand jury, and the evidence at trial shows that such means, instrument, or weapon was known, then it is incumbent upon the State to prove at trial that the

unknown fact was indeed unknown to the grand jury and that the grand jury used a reasonably diligent attempt to ascertain that unknown fact. *See Polk v. State,* 749 S.W.2d 813, 816–17 (Tex.Crim.App.1988). According to appellant, the evidence at trial, contrary to the indictment and the charge, clearly established that the murder weapon was a knife. Despite this evidence, appellant argues, the State did not present testimony or other evidence that the grand jury did not have knowledge of the type of weapon used in this murder, nor did the State show that the grand jury, after a reasonably diligent inquiry, could not have discovered the type of weapon used in the murder. *See Polk,* 749 S.W.2d at 817; *Matson v. State,* 819 S.W.2d 839, 847 (Tex.Crim.App.1991) (citing *Payne v. State,* 487 S.W.2d 71, 72 (Tex.Crim.App. 1972)). Thus, appellant asserts, the State failed to prove beyond a reasonable doubt that the defendant killed the deceased with an unknown weapon, and as such, his conviction cannot stand.

 It is a fundamental rule of criminal law that one cannot be convicted of a crime unless it is shown beyond a reasonable doubt that the defendant committed each element of the alleged offense. U.S. Const. amend. XIV, Tex.Code Crim. Proc. Ann. art. 38.03 (Vernon Supp.1997); Tex. Pen.Code Ann. § 2.01 (Vernon 1994); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368, 375 (1970); *Alvarado v. State,* 912 S.W.2d 199, 206–07 (Tex.Crim.App.1995). To determine whether the State proved each element of the alleged crime, we examine the verdict, "after viewing the evidence in the light most favorable to the verdict," to determine whether "*any* rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis in original); *Ex parte Elizondo,* 947 S.W.2d 202, 205–06 (Tex.Crim.App., 1996); *Griffin v. State,* 614 S.W.2d 155, 158–59 (Tex.Crim.

App.1981).[1] "If a reviewing court determines that the evidence is insufficient under the *Jackson* standard, it must render a judgment of acquittal." *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App.1996) (citing *Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982)).

Under a legal sufficiency standard of review, the court in *Matson v. State* had occasion to restate the rule applicable in a case in which the indictment contained allegations similar to this one. In such instances, it instructed:

When an indictment alleges that the manner or means utilized to inflict an injury is unknown and the evidence at trial does not show what type of object was used, a prima facie showing exists that the object was unknown to the grand jury. (citations omitted). If, however, evidence at trial shows what object was used to inflict the injury, an issue is raised with respect to whether the grand jury had information, when it handed down the indictment, as to the object used. (citation omitted). Only in such a case, must the State prove that the grand jury did not know the manner or means of inflicting injury and that the grand jury used due diligence in its attempts to ascertain the manner or means.

819 S.W.2d at 847 (citing *Payne,* 487 S.W.2d at 72).

As support for his argument that an issue was raised as to whether the weapon was unknown, appellant cites to the Penal Code definition of a knife: "any bladed hand instrument that is capable of inflicting serious bodily injury or death by cutting or stabbing a person with the instrument." Tex. Penal Code Ann. § 46.01(7). He points out that this definition, unlike any other Chapter 46 definition, does not require that a weapon be designed or made for a purpose. Thus, he reasons, the definition is so broad that it "includes any such instrument capable of being used in the described manner," *i.e.,* stab-

---

1. Although appellant challenges the legal sufficiency of the evidence to support his conviction, we do not find that *Malik v. State,* 953 S.W.2d 234 (Tex.Crim.App. 1997), controls here because, unlike the issue in *Malik,* the issue in this case concerns a variance between the pleadings and the proof established at trial. The issue in *Malik,* on the other hand, dealt with the jury charge containing an additional, nonessential element of the offense. As such, the standard of review established in *Malik* is inappropriate for this case.

bing, and therefore, "virtually any bladed instrument that one person actually uses to stab another" falls within the definition of a knife. He asserts that "it is nearly axiomatic that if one person is stabbed by another," then they must have been stabbed "with a knife." He concludes, that because the grand jury knew, as shown by the evidence at trial, that the deceased was stabbed, and because § 46.01(7) of the Texas Penal Code broadly defines knife, an issue was raised as to whether the grand jury knew or could have known that the weapon was a knife, and thus rebutting the prima facie showing that it was unknown. Therefore, the State was required to, and failed, to put forth evidence that the weapon was unknown.

In addition, appellant cites portions of the testimony of the three expert witnesses and argues that they testified that the murder weapon was a knife, which also rebutted the prima facie showing that the weapon was unknown. Two of these witnesses, Drs. Harold Gill–King and Randall Frost, testified for the State. The other, Dr. Steven A. Symes, testified for the defense. Doctor Gill–King is an expert in anthropology and forensic pathology and director of the Laboratory for Human Identification and Forensic Anthropology at the University of North Texas Health Science Center. Doctor Frost is a forensic pathologist with the Lubbock County Medical Examiner's Office. Doctor Symes is a forensic anthropologist and is an instructor at the University of Tennessee Medical School and is an Assistant Director of the Regional Forensic Center in Memphis, Tennessee.

With regard to Dr. Gill–King's testimony, appellant specifically refers to the doctor's statements about the marks left on the skeletal remains of the victim. In advancing his position, he relies upon two of the doctor's responses. The first of these responses occurred during the doctor's direct examination, when he was queried if anyone would ever be able to tell the exact object that was used to stab the deceased. The doctor replied that he could not tell from the marks shown on the remains, and observed "that there are individual instances in which a particular knife or sharp object can be relat-ed to a hard tissue injury." "However," he continued, "you must bear in mind that knives, because of the way they're manufactured, do not transfer material." His second response was made during cross-examination when he was asked if an exemplar knife (State's Exhibit 19) was the knife used to cause the marks found on the skeletal remains. He replied that although that knife belonged to a class which could have produced the injuries, it was not possible to determine whether or not "the specific knife in question" produced the injury marks on the bones. Reasoning from those responses and from the doctor's oft-repeated observation during his testimony that the instrument that caused the bone marks was a pointed, single edged blade, appellant concludes that the "overwhelmingly clear opinion of Doctor Gill–King was that the weapon which left its mark was a knife."

We disagree with appellant's characterization of Dr. Gill–King's opinion. First, it should be noted that his testimony was quite extensive, covering some 74 pages of the record, and is obviously too long to be quoted in detail here. Given Dr. Gill–King's extensive testimony, we note that the responses singled out by appellant were only a small part of his testimony and were in reply to specific questions about a knife. Moreover, we observe that the doctor's first response, rather than being limited only to a knife, was descriptive of a "knife or sharp object." Second, we do not agree with appellant's assertion that the doctor's conclusion that the bone marks were caused by a pointed, single-edged blade clearly indicates his opinion that the instrument used must have been a knife. While that description could be used to describe a knife, it also could be used to describe other instruments. For example, the term "blade" is defined in the Reader's Digest Great Encyclopedic Dictionary in pertinent part as "the flat, cutting part of any edged tool or weapon; the thin, flat part of an oar, plow, etc.; ... a sword." In Roget's II, The New Thesaurus, it is defined as "the cutting edge of a sharp instrument." Indeed, in the course of his testimony, Dr. Gill–King averred that he had used several instruments including "cleavers, machetes, axes, blades, and so forth" to simulate similar

injuries upon bone, and the injuries suffered by the victim are "of the type that would be produced by a sharp object," not just a knife. Third, Dr. Gill–King also agreed that it was not possible to determine from the injuries the exact object used to stab the deceased. Our review of Dr. Gill–King's testimony leads us to conclude that a more accurate summation of his testimony would be that in his opinion, the murder weapon fell within the broad category of instruments quoted above. In other words, while it could have been a knife, it also could have been one of a number of other items that had a cutting edge.

With reference to Dr. Frost's testimony, appellant acknowledges that the doctor used the term "stabbing" throughout his testimony. That, of course, is an amorphous term that could refer to almost any type of pointed instrument. However, appellant goes on to argue that at one point in the doctor's testimony, he "dropped the artificial generic phrasing and referred to the weapon as a knife," and concludes that at "no point did Dr. Frost refer to the nature of the weapon as unknown, nor did he ever suggest that the weapon could be anything other than a knife." The colloquy giving rise to this argument is as follows:

Q. Okay. And the bones of the vertebrae of a human being, are they pretty hard to jam a knife through them like that?

A. Most of the bones in a young individual are fairly hard, and it takes some force to put a knife blade through them.

Viewed in its context, the exchange concerned the makeup of bones such as those in evidence, and was not an attempt by the doctor to specifically characterize the murder weapon as a knife.

With regard to Dr. Symes's testimony, appellant argues that at no time did Dr. Symes suggest that the weapon used was anything but a knife and concludes the only relevant question in Symes's mind "was whether or not the knife that was used to stab the victim was State's Exhibit 19 (the exemplar knife)." Doctor Symes had been sent both the skeletal remains and State's Exhibit 19, and consequently his testimony primarily concerned experiments he had conducted to determine whether the markings on the skeleton were produced by State's Exhibit 19. Although, as appellant suggests, based only upon the knife's dimensions, Dr. Symes could not exclude State's Exhibit 19, the doctor did opine that "it's difficult for me to imagine this knife had been used to stab bone or hit bone." To properly discuss that argument, it is necessary to set out in some detail the colloquy, a portion of which appellant quotes in advancing this argument.

Q. Okay. Now—And in a body that's found out in a county a year to three years before, it's hard to match up an exact weapon; is that right?

A. Yes. It's hard to match up a weapon any time.

Q. Okay. Well, let me ask you this. Would it be fair to say, from your experience and training, that Belynda Tillery was stabbed with a weapon that's unknown?

A. Unknown, it's unknown to me. I can give a brief description of it, but it's unknown.

Q. Okay. What would your brief description be?

A. It's a knife that is pointed at the end. It is, without going into detail, I think at one inch from the tip, it is probably .07 inches wide or less. It's single edged. That's probably about as good of a description I can give.

Q. Okay. Maybe a folding buck knife that somebody would carry a large one on their belt? Would that be consistent?

A. How large?

Q. Three to four inch blade.

A. Okay. I would have to measure the width on it, but it's—it could possibly be consistent with.

Q. Okay. But she was stabbed with an object that's unknown basically; is that right?

A. I can't match this weapon to it positively.

Q. Okay. Or it could be a knife with a blade, I don't know, seven, eight, nine inches long?

A. Yeah. I have no indication of total length of the knife.

Q. Okay. And that's why in your experience—You've testified in Court and worked on cases before; is that right?

A. Uh-huh. Uh-huh.

Q. And that's why on cases where you find bones that have been stabbed, or when you put them together, unless you have a weapon there, you just allege it as an unknown weapon; is that right?

A. Yeah. I don't use the term unknown. I just describe what I know about the weapon, but it's unknown to me obviously.

We agree with the State that the evidence in this case is similar to that before the court in *McIntosh v. State*, 855 S.W.2d 753 (Tex. App.—Dallas 1993, pet. ref'd). *See also Hicks v. State*, 860 S.W.2d 419, 424–26 (Tex. Crim.App.1993) (holding that "[b]ecause the evidence is inconclusive as to the instrumentality that was responsible for the deceased's death, the State need not prove that the grand jury used due diligence in attempting to ascertain the murder weapon"). In *McIntosh*, the indictment charged that the victim's death was caused by stabbing or cutting the victim "with a sharp edged instrument being unknown to the Grand Jury." *Id.* at 766. The expert testimony concluded that the wounds in the deceased's body were made by an instrument with a serrated edge. The determination was that the cause of death was due to being "stabbed and cut with a sharp-bladed /edged instrument consistent with a knife, but with the exact description of the instrument being unknown." *Id.* In *McIntosh*, as in this one, the appellant argued that the evidence showed the death instrument was a knife. In rejecting that argument, the court commented, "while the evidence indicated the instrument could have been knife, the exact description of the instrument was unknown." *Id.* Thus, it concluded, "the State did not have to prove the Grand Jury exercised due diligence in attempting to discover the death weapon." *Id.* at 767. Likewise, while some evidence in this case indicates the death weapon could have been a knife, we find after reviewing the testimony in its context, the exact type of blade causing the wounds could only be determined by speculation. Therefore, we conclude, as did the *McIntosh* court, the State did not have to prove due diligence on the part of the Grand Jury.

In his second legal sufficiency challenge, appellant argues that the evidence was legally insufficient to establish that stabbing was the victim's actual cause of death. Without extending the length of this opinion by extensively setting out the evidence, a good portion of which we have already quoted, we find that the jury could rationally conclude that stabbing with a bladed instrument was the cause of death. Appellant's first two points of error are overruled.

Appellant, in his third point of error, contends that the evidence was factually insufficient to prove he was the individual who committed the murder charged in the indictment and was factually insufficient to prove that the stabbing was the cause of death of the victim. The standard of review here requires us to set aside the verdict only if, after reviewing all the evidence, we find that the verdict "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis v. State*, 922 S.W.2d at 129. Under the *Jackson* legal sufficiency standard of review, the review is the same whether the evidence is direct or circumstantial. *King v. State*, 895 S.W.2d 701, 702 (Tex.Crim.App.1995); *Geesa v. State*, 820 S.W.2d 154, 155–61 (Tex.Crim.App. 1991). We find this same principle equally applies to a *Clewis* factual sufficiency standard of review. Although originally part of the doctrine that required circumstantial evidence to exclude every other reasonable hypothesis of innocence in order to convict a defendant, *see Sullivan v. State*, 564 S.W.2d 698, 705 (Tex.Crim.App.1977), the principles that "it is not necessary that every fact point directly and independently to the defendant's guilt," and "it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances," have taken a life of their own and come to represent the general meaning of circumstantial evidence. *See Robertson v. State*, 888 S.W.2d 493, 495 (Tex.App.—Amarillo 1994, pet. ref'd); *Pesina v. State*, 949 S.W.2d 374, 377 (Tex.App.—San Antonio 1997, no pet.); *Sparks v. State*, 935 S.W.2d 462, 464

(Tex.App.—Tyler 1996, no pet.).[2] Thus, we will review all the evidence, whether direct or circumstantial, to determine if the verdict should be reversed under the test established in *Clewis.*

■ First, appellant challenges the finding that he was the assailant by pointing out that the only testimony that connects him to the murder is that of his former girlfriend, Angela Allen. Her testimony, he argues, is "patently untrustworthy" because she had every motive to get even with appellant, and her testimony contradicts that of other witnesses. It has long been the rule that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Martinez v. State,* 699 S.W.2d 910, 914 (Tex.App.—Amarillo 1985, no pet.) (citing *Johnson v. State,* 571 S.W.2d 170, 173 (Tex. Crim.App.1978)).

Second, appellant challenges the jury's finding that stabbing was the cause of death. In Dr. Gill–King's testimony, he stated that he counted at least five, and possibly eleven, "striking" stab wounds to the deceased's ribs and vertebra. He also commented that "[y]ou have to keep in mind that when we have only [a] hard tissue (bones) to deal with, we really can't say anything about the number of soft tissue only injuries." In response to the prosecutor's query whether the injuries were consistent with someone being stabbed to death, the doctor responded, "[a]t the very least, you would have to say that those injuries are contributing causes." When asked if it was most likely that the victim "laid out there bleeding to death," Dr. Frost opined, "[i]f we look at the cause of death as a stab wound or multiple stab wounds, the mechanism of death would be bleeding or exsanguination, so, yes, she bled to death." In his cross-examination, Dr. Symes averred he found a minimum of 12 separate stab wounds which he would consider "overkill."

After our examination of the entire record and after giving due deference to the jury's determination of credibility, we conclude that the jury's verdict finding that appellant caused the victim's death by stabbing is not so against the overwhelming weight of the evidence as to be clearly wrong and unjust. Appellant's third point is overruled.

■ Appellant claims under his fourth point that the State failed to disclose evidence favorable to him is directed at the State's witness Walter Tillery. At pretrial, the prosecution had been instructed to either provide exculpatory and impeachment evidence to appellant or submit it to the trial court for a determination whether it should be supplied to appellant. Tillery testified for the State on December 4, 1996. During his cross-examination of Tillery, appellant learned that the witness had informed the prosecutor on December 2, 1996, that he had suffered an electrocution accident in April 1994 which affected his short term memory and caused him to lose his senses of smell and taste and the feeling in his right hand. He was first approached by investigators for the State in October 1994. Tillery testified that he was 100% sure of the facts which he had given the State and about which he testified.

After Tillery's examination, appellant, arguing the State had violated the court's order by failing to reveal the accident, moved for a mistrial or a continuance to permit his investigation of the witness's loss of memory. After refusing to grant a mistrial, the trial court commented that it thought that the information was "impeaching evidence" and should have been disclosed. The trial court then instructed appellant's counsel to have his investigator contact the custodian of the medical records to "see how long it's going to take to get those, and then, let [him] know." The prosecutor explained that she failed to notify appellant because the witness told her his memory loss was short term and only caused him to forget "little things." Afterward, the judge returned the jury to the

2. Because courts continue to cite these principles related to circumstantial evidence after *Geesa,* 820 S.W.2d 154, and *Griffin,* 614 S.W.2d 155, we can safely reason that no other purpose remains other than to define circumstantial evidence.

courtroom and the trial was completed without any attempt to recall Tillery for further cross-examination or any further request for a ruling on a continuance.

▆▆▆▆▆ Under the Due Process Clause of the Fourteenth Amendment, a conviction must be reversed if the prosecution "fails to disclose evidence which is favorable to the accused that creates a probability sufficient to undermine the confidence in the outcome of the proceeding." *Thomas v. State,* 841 S.W.2d 399, 404 (Tex.Crim.App.1992). In determining whether reversible error occurred, we review three necessary factors: 1) whether the prosecution failed to disclose evidence; 2) whether such evidence is favorable to the defendant; and 3) whether such evidence, if properly disclosed, would have in reasonable probability affected the outcome of the proceedings. *Id.*

First, because the prosecution failed to advise appellant of Tillery's accident when they first learned of it, we find that the prosecution failed to properly disclose evidence. Second, it has been held that favorable evidence includes impeachment evidence as well as exculpatory evidence. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Thomas,* 841 S.W.2d at 404. Here, appellant points out that Tillery was the only witness who testified that appellant may have known that the victim's baby [3] was not his and may have been angered by that knowledge. This testimony, he reasons, provided a motive for the murder that appeared nowhere else in the record. Consequently, we find that impeaching Tillery's ability to recall facts would have been beneficial to appellant.

Finally, in this case, the ability to challenge the credibility of the only witness who gave testimony of a possible motive can reasonably be viewed as important. Additionally, and as argued by appellant, Tillery's testimony also supported the testimony of Angela Allen, who alleged facts linking appellant to the murder of Belynda Tillery. Thus, it is argued by appellant, the effect of Tillery's testimony was "profound." He concludes that had the defense been aware of the impeachment evidence prior to trial, he could have certainly been more readily impeached.

However, even though the fact of the accident was not discovered until trial, counsel did have an opportunity to cross-examine Tillery about the effect of the accident. After the cross-examination, the trial court gave appellant an opportunity to obtain Tillery's medical records for additional cross-examination. He did not do so. While we can only speculate about trial counsel's reasons for not taking the opportunity afforded him, it is reasonable to assume that it was a matter of trial strategy. Examination of the entire record reveals that appellant's trial counsel did a competent and efficient job of conducting the defense. While the testimony of the witness may indeed have been crucial, that fact alone is not enough to warrant us in concluding that a discovery of the accident two days earlier would have given appellant more of an opportunity to challenge Tillery's testimony. Parenthetically, appellant does not contend that the State became aware of the fact of the accident earlier than the date given by the prosecutor. Because appellant had an opportunity to cross-examine Tillery about his ability to recall facts, and because appellant did not take advantage of the trial court's offer to allow appellant to investigate Tillery's medical records and report any relevant findings to the trial court, we find that it is not reasonably probable that the outcome would have been different had the prosecutor revealed two days earlier that Tillery had suffered from a severe electrocution. Appellant's fourth point is overruled.

In final summary, all of appellant's points are overruled and the judgment of the trial court is affirmed.

---

**3.** There was evidence that the victim had been a girlfriend of appellant.