NO. 07-01-0106-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

MAY 9, 2002

_____

GABRIEL URBAN ESQUIVEL, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 251ST DISTRICT COURT OF POTTER COUNTY;

NO. 37,980-C; HONORABLE PATRICK A. PIRTLE, JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

Upon a plea of not guilty, appellant Gabriel Urban Esquivel was convicted by a jury of capital murder and punishment was assessed at life imprisonment. He challenges his conviction by three points of error. By points one and two, he contends the evidence is legally and factually insufficient to establish that he intentionally and knowingly caused the death of the victim while in the commission of the felony offense of robbery. By his third

point, he asserts the trial court erred in admitting into evidence State's Exhibits 154, 143, 168, 161, 149, 85, 84, 77, 152, 144, 166, and 165 contending they were more prejudicial than probative. Based upon the rationale expressed herein, we affirm.

Early in the morning of July 1, 1997, operators of a Burlington/Santa Fe Railroad train unavoidably ran over the motionless body of a 19-year old female and she was decapitated as a result. Investigating police observed evidence of assaultive abrasions and scrapes on the victim's body. Police investigation revealed that during the late evening hours of June 30, 1997, and the early morning hours of July 1, 1997, appellant, along with other young males, were out "kicking it" and drinking beer. When the group ran out of beer, Adrian Esquivel, appellant's older brother, and a juvenile member of the group took a car without consent from the father of the juvenile to make a "beer run." After stealing some beer, the group stole some ice from a local hotel to put on the beer in the trunk of the car and then went to the victim's house. The group left the house shortly thereafter and, with Adrian driving, made a turn too fast and hit a curb, causing two flat tires. After the group exited the car, they hid the beer, and appellant and Fidencio Flores[1] left. At approximately 2:06 a.m. police officers responding to a disturbance call noticed the group's car parked behind a house in an alley. After conducting field interviews, the juveniles were escorted to their homes for curfew violations. Adrian remained at the scene

---

[1]Fidencio Flores was also convicted of the capital murder of the 19-year old victim, and by opinion dated June 22, 2000, his conviction was affirmed.

2

and changed the flat tires. He was allowed to leave at approximately 3:00 a.m. and the owner of the car was contacted to pick up the car.

According to appellant's statement to the police, he and Fidencio walked to the victim's[2] house after the car was disabled to ask for a ride and return to the scene to pick up Adrian. The victim borrowed her stepfather's car and the three went to check on Adrian. While the victim was driving, she, appellant, and Fidencio stopped at a point where they could see the police and what was taking place. They didn't notice anyone except for police officers around the car and decided to drive back to the victim's house. Shortly thereafter, appellant, at Fidencio's insistence, asked the victim to drive them back to the scene of the disabled car to look for Adrian. The victim was driving and appellant was in the front seat and Fidencio was in the back seat. Upon arriving at the scene, appellant exited the car to relieve himself nearby and then stood outside the car to observe the police. According to appellant's written statement, when he got back in the car Fidencio was in the driver's seat and the victim was lying on the back seat beaten and bloody. However, according to appellant's oral statement that was transcribed and played for the jury, upon returning to the car, he saw Fidencio wrap a rag around the victim's neck and pull her into the back seat where he proceeded to punch and beat her while shouting driving directions to appellant. Appellant drove east toward railroad tracks and parked in some tall weeds. The victim was carried over a barbed wire fence, where her clothes got

---

[2]The victim was Adrian's former girlfriend and the two remained friends.

3

caught and ripped. She was placed on the railroad tracks lying face down with her head and one of her arms across one rail.

A short time later a call was made by a locomotive engineer to the assistant train master in charge of the yards in Amarillo to report that he had seen an "object" on the south tracks parallel to the north tracks his train was traveling along. A passing train on the south track was unable to stop in time and decapitated the victim's head and part of her upper left arm and shoulder.

After appellant and Fidencio left the scene they drove to Fidencio's residence, but when no one answered the door they drove to appellant's house. After Fidencio changed his clothes and shoes, the two "kicked back and smoked a cigarette." Thereafter, with Fidencio at the wheel, they drove to a friend's house in the victim's car looking for Adrian. Although their friend was not home, he was on the phone speaking with his sister and appellant was allowed to speak with him. He asked appellant to come pick him up at a residence in the neighborhood. Appellant drove the victim's car with Fidencio in the front seat.

Meanwhile, the victim's stepfather and sister, together with Adrian, became concerned that the victim had not returned home and called the police and went out looking for her. While they were driving in the neighborhood, they noticed the car the victim had been driving pass them in the opposite direction and turned and followed.

4

Unaware who was following, appellant tried to get away, but ran over a curb and sustained a flat tire. After Adrian got out of the car and demanded to know the victim's whereabouts, Fidencio fled on foot and appellant took Adrian aside and told him everything that had happened, including that the victim was "somewhere down by the tracks."

According to Officer Greg Pace, he was dispatched to the crime scene at 4:25 a.m. Although it was dark outside, the spotlight on the train aided him in observing an individual walking on the tracks toward the train. He identified the person as Adrian and testified he was "distraught and upset." A few minutes later he observed another person tracing Adrian's steps along the tracks. That person was identified as appellant and both he and Adrian were placed in patrol cars until the investigation was concluded.

By his first and second points of error, appellant contends the evidence is legally and factually insufficient to establish that he intentionally and knowingly caused the death of the victim while in the commission of the felony offense of robbery. We disagree. When both the legal and factual sufficiency of the evidence are challenged, we must first determine whether the evidence is legally sufficient to support the verdict. Clewis v. State, 922 S.W.2d 126, 133 (Tex.Cr.App. 1996). It is a fundamental rule of criminal law that one cannot be convicted of a crime unless it is shown beyond a reasonable doubt that the defendant committed each element of the alleged offense. U.S. Const. amend. XIV; Tex. Code Crim. Proc. Ann. art. 38.03 (Vernon Supp. 2002); Tex. Pen. Code Ann. § 2.01 (Vernon 1994). In conducting a legal sufficiency review, we examine the verdict, after

5

viewing the evidence in the light most favorable to the prosecution, to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); Geesa v. State, 820 S.W.2d 154, 157 (Tex.Cr.App. 1991), *overruled on other grounds*, Paulson v. State, 28 S.W.3d 570, 573 (Tex.Cr.App. 2000). As an appellate court, we may not sit as a thirteenth juror, but must uphold the jury's verdict unless it is irrational or unsupported by more than a "mere modicum" of evidence. Moreno v. State, 755 S.W.2d 866, 867 (Tex.Cr.App. 1988). The standard of review is the same for direct and circumstantial evidence cases. Butler v. State, 769 S.W.2d 234, 238 (Tex.Cr.App. 1989), *overruled on other grounds*, *Geesa*, 820 S.W.2d at 161.

After conducting a legal sufficiency review under *Jackson*, we may proceed with a factual sufficiency review. *Clewis*, 922 S.W.2d at 133. As an appellate court, we view all the evidence without the prism of "in the light most favorable to the prosecution" and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Johnson v. State, 23 S.W.3d 1, 9 (Tex.Cr.App. 2000). It is the exclusive province of the jury to determine the credibility of the witnesses and the weight to be given their testimony, and unless the record clearly demonstrates a different result is appropriate, we must defer to the jury's determination. *Id.* at 8.

Before determining whether the evidence is legally sufficient to sustain the conviction, we must review the essential elements the State was required to prove. Capital

6

murder requires proof that appellant intentionally or knowingly caused the death of an individual in the course of committing or attempting to commit robbery. Tex. Pen. Code Ann. §§ 19.03(a)(2) and 29.02(a) (Vernon 1994); *see also* Hall v. State, 970 S.W.2d 137, 140 (Tex.App.–Amarillo 1998, pet. ref'd) (noting that capital murder requires proof of, among other things, that the defendant killed the decedent and intended to obtain or maintain control of the decedent's property prior to or during the killing). The point at which the accused developed the requisite intent for robbery is critical, for it must show that he intended to take the victim's property before, or as, he murdered. *Id.* Evidence that shows the taking of property was an afterthought is insufficient to support a capital murder conviction. Alvarado v. State, 912 S.W.2d 199, 207 (Tex.Cr.App. 1995) (en banc). However, the evidence is sufficient if the State proves that the robbery of the victim occurred immediately after the murder of the victim. Nelson v. State, 848 S.W.2d 126, 131-32 (Tex.Cr.App. 1992) (en banc), *cert. denied*, 510 U.S. 830, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993). If the State proves that the requisite intent was present, it has proven that a murder occurred in the course of robbery, even though the element of appropriation occurred after the murder. *Id*. Additionally, in determining what appellant's intent was at the time, the fact finder is free to look to the conduct of the accused and make reasonable inferences therefrom. Robertson v. State, 871 S.W.2d 701, 705-06 (Tex.Cr.App. 1993), *cert. denied*, 513 U.S. 853, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994).

7

Appellant urges that the State failed to prove beyond a reasonable doubt that he had the culpable mental state of intentionally and knowingly committing murder while in the course of robbery. Murder, intentionally or knowingly, is a result oriented offense. Cook v. State, 884 S.W.2d 485, 490 (Tex.Cr.App. 1994). The accused must have intended the result, death, or have been aware that his conduct was reasonably certain to cause that result. *Id.* Section 6.03 of the Texas Penal Code defines intentionally and knowingly as follows:

> (a) A person acts intentionally . . . with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> (b) A person acts knowingly . . . with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

In determining the legal sufficiency of the evidence to show appellant's intent or knowledge, and faced with a record that supports conflicting inferences, we must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution. Couchman v. State, 3 S.W.3d 155, 163 (Tex.App.--Fort Worth 1999, pet. ref'd), citing Matson v. State, 819 S.W.2d 839, 846 (Tex.Cr.App. 1991). Further, in circumstantial evidence cases it is not necessary that every fact point directly and independently to the accused's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the

8

incriminating circumstances. Johnson v. State, 871 S.W.2d 183, 186 (Tex.Cr.App. 1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994); Armstrong v. State, 958 S.W.2d 278, 283 (Tex.App.--Amarillo 1997, pet. ref'd).

After leaving the crime scene with police, appellant voluntarily gave a written and oral statement. According to Patrol Sergeant Paul Horn, who conducted the interview, appellant was "anxious to talk" and after his rights were administered, he gave his statement. He also consented to the taking of his blood, dental impression, and hair samples. Upon learning that an impression of a footprint on the victim's shirt might match his shoe, appellant conceded that he helped drag the victim's body across the barbed wire fence and onto the tracks and that he might have inadvertently stepped on her. By his statements, appellant implicated Fidencio as the instigator and described his participation as being in the wrong place at the wrong time.

The State established that appellant was with the victim in her car when she was beaten unconscious. According to appellant, there was a massive amount of blood in the car. The evidence also showed that appellant participated in dragging the victim over the barbed wire fence and laying her body across the railroad tracks.

The medical examiner that performed the autopsy testified that the victim's body was received in four pieces and sustained a total of 86 injuries by amputation and blunt force trauma. After his examination he concluded that the victim was still alive when she

9

was placed on the tracks. He described a series of abrasions and linear scratches consistent with being dragged over a barbed wire fence. Numerous bruises were explained and the victim's black eyes were described as being enhanced by a factor of ten over injuries sustained from a fist fight. The examiner testified about multiple internal injuries, but noted that the only life threatening injury was to the liver. He was unable to determine whether the victim's brain injury could have been fatal because it was so distorted by the train overrun. He concluded that the cause of death was multiple blunt force trauma due to beatings and trauma caused by the train overrun. Further, he explained that the manner of death was a homicide, which he described as a death occurring at the hands of another through intent or negligence.

By cross-examination, the defense attempted to establish that because the only life threatening injury to the victim was sustained by her liver, the superceding cause of death was attributable to the train. However, appellant should have been aware that the victim's death would result from his conduct in helping drag the badly beaten and unconscious victim over the barbed wire fence and placing her on the railroad tracks.

Appellant was driving the victim's car when he was pursued by her stepfather, sister, and Adrian, and the victim was not in the car. The victim's stepfather testified that appellant did not have permission to drive the car. By his oral statement, appellant claimed that as the victim was being beaten she yelled, "You can take it. You can have the car. You can have whatever you want. Just don't hurt me." An inmate with whom

appellant was transported to the courthouse testified that appellant told him that he and Fidencio killed the victim to steal her car for the stereo. Appellant's conduct and the reasonable inferences therefrom show that appellant intended to steal the car while the victim was being beaten, and the car was in fact stolen immediately after the victim was placed on the tracks. *Hall*, 970 S.W.2d at 140. There is no evidence to show that the victim's car was stolen as an afterthought. Thus, the combined and cumulative force of all the incriminating circumstances establish that the evidence is legally sufficient to support appellant's conviction for capital murder. Point of error one is overruled.

Having concluded that the evidence is legally sufficient to support the verdict, we must now determine, after a neutral review of all the evidence, whether it is factually sufficient to support the verdict. *Johnson*, 23 S.W.3d at 11. It is the exclusive province of the fact finder to determine the credibility of the witnesses and the weight to be given their testimony. Johnson v. State, 571 S.W.2d 170, 173 (Tex.Cr.App. 1978); *Armstrong*, 958 S.W.2d at 284.

Although conflicting at times, the evidence established that appellant was in the car when the victim was beaten unconscious. Appellant also admitted that he participated in dragging the victim over the barbed wire fence and in helping place her body over the railroad tracks in a manner that was certain to cause death. He drove her car without consent and told a third person that he and Fidencio intended to steal the car to retrieve the stereo. Based on the foregoing evidence, we do not find that the verdict is so contrary

11

to the overwhelming weight of the evidence as to require a different result.  Accordingly, reviewing the evidence under *Johnson*, 23 S.W.3d at 11, and without substituting our own judgment, we conclude that the evidence is factually sufficient to support the verdict. Point of error two is overruled.

By his third point of error, appellant asserts the trial court erred in applying the balancing test of Rule 403 of the Texas Rules of Evidence and admitting into evidence photographs labeled State's Exhibits 154, 143, 168, 161, 149, 85, 84, 77, 152, 144, 166, and 165 contending they were more prejudicial than probative.  We disagree.  The admission of photographs into evidence is within the discretion of the trial court and will not be disturbed absent an abuse of that discretion.  Wyatt v. State, 23 S.W.3d 18, 29 (Tex.Cr.App. 2000).  Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."  The rule creates a presumption of admissibility of all relevant evidence and authorizes the trial court to exclude such evidence only when there is a "clear disparity between the degree of prejudice of the offered evidence and its probative value." Mozon v. State, 991 S.W.2d 841, 847 (Tex.Cr.App. 1999).

In reviewing the trial court's balancing test determination, a reviewing court is to reverse the trial court's decision "rarely and only after a clear abuse of discretion." *Mozon*, 991 S.W.2d at 847, citing Montgomery v. State, 810 S.W.2d 372, 389 (Tex.Cr.App. 1991) (op. on reh'g).  The trial court's ruling must be measured against the relevant criteria by

12

which a Rule 403 decision is made.  *Montgomery*, 810 S.W.2d at 392.  The relevant criteria include:

> (1) how compelling the extraneous offense evidence serves to make a fact of consequence more or less probable–a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the offense;
>
> (2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";
>
> (3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and
>
> (4) the force of the proponent's need fo this evidence to prove a fact of consequence, *i.e.*, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*Santellan v. State*, 939 S.W.2d 155, 169 (Tex.Cr.App. 1997), citing *Montgomery*, 810 S.W.2d at 389-90; *see also* Long v. State, 823 S.W.2d 259, 270, *cert. denied*, 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992) (noting that the prejudicial effect of photographs may also be determined by the number of exhibits offered, their gruesomeness, detail, and size, whether they are black and white or color, whether they are close-up, and whether the body is clothed).

Appellant complains about the following autopsy photographs admitted into evidence:

- No. 154–left eye depicting hemorrhage;
- No. 143–right eye depicting hemorrhage;

13

- No. 168--upper torso depicting site of decapitated head and severed left shoulder;

- No. 161–back side of torso depicting scratches on buttocks and severed left arm;

- No. 149–back side of legs depicting scratches;

- No. 85–severed lower left arm;

- No. 84–right arm and hip area depicting scratches and bruising;

- No. 77–legs depicting wounds and pink ankle cord on left ankle;

- No. 152–decapitated head depicting tearing of scalp and exposed brain matter;

- No. 144–decapitated head and exposed brain matter with measuring device;

- No. 166–decapitated head with a left side view; and

- No. 165–decapitated head with view from chin and throat.

Without authority, appellant argues that autopsy photographs should not be admitted into evidence when an alternative method such as a drawing can be used to aid the trier of fact. However, autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. Rojas v. State, 986 S.W.2d 241, 249 (Tex.Cr.App. 1998). None of the photographs admitted into evidence reflect mutilation from the autopsy.

At the time the exhibits were offered by the State, appellant objected on Rule 403 grounds. After the exhibits were admitted, the medical examiner explained the necessity of the photographs to assist in his testimony of the different injuries the victim sustained to multiple parts of her body. Although exhibits 152 and 144 both depict the victim's

14

decapitated head and exposed brain matter, the medical examiner explained that exhibit 152 showed more of the full frontal face and the top surface of the head while exhibit 144 illustrated the injuries the victim sustained to the side of her head. According to the medical examiner, the exhibits showing different views and aspects of the victim's body parts were necessary to assist him in differentiating between the numerous injuries. Although some could have been considered repulsive, "they portrayed no more than the gruesomeness of the injuries inflicted." *Wyatt*, 23 S.W.2d at 30.

Where, as here, there was no direct evidence that appellant caused the victim's death, the photographs of the injuries sustained by the victim served to make a fact of consequence, *i.e.*, appellant's intent to cause the victim's death by blunt force trauma, more probable. Thus, not only was the evidence relevant, the State also established a need for the evidence. Appellant has failed to show that the prejudicial impact of the autopsy photographs outweighed their probative value. We find that the trial court did not abuse its discretion in admitting the 12 photographs of which appellant complains. Point of error three is overruled.

Accordingly, the judgment of the trial court is affirmed.


Don H. Reavis
Justice


15

Do not publish.